| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| and | )<br>) Case No. 6:11-CV-03367 –MDH |
| DEANNA CLOUSE, f/k/a DEANNA ROBERTS, | )<br>)<br>) |
| Plaintiff-Intervenor, | ) |
| v. | )<br>) |
| NEW PRIME, INC., | )<br>) |
| Defendant. | ) |

**PLAINTIFF EEOC'S SUGGESTIONS IN OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE PROPOSED EXPERT TESTIMONY
OF ROBERT M. LAJEUNESSE, PH.D**

DAYNA DECK
Senior Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Robert A. Young Federal Bldg.
1222 Spruce St., Room 8.100
St. Louis, MO 63103
(314) 539-7914

# TABLE OF CONTENTS

Table of Contents…………………………………………………………………..ii

Table of Authorities…………………………………………………………………..iii

   I. Introduction……………………………………………………………………1

   II. Argument………………………………………………………………………1

        A. LaJeunesse properly calculated victim's back pay damages by considering victims' work histories during the mitigation period and adjusting the estimates accordingly…………………………………..1

            1. Victims' work histories prior to their application to Prime irrelevant to back pay damages………………………………………1

            2. Victims' work histories during the mitigation period are relevant, and LaJeunnesse properly accounted for them in his back pay calculations……………………………………………….4

        B. LaJeunnesse properly declined to consider statistics about Prime's PSD program participants in calculating victims' back pay damages……5

        C. LaJeunnesse properly declined to consider Prime's turnover rates in calculating victims' back pay damages………………………………..7

        D. LaJeunnesse properly calculated the value of victims' lost fringe benefits according to valid statistics and methodology widely used in the field of forensic economics…………………………………….11

        E. LaJeunnesse properly calculated the gross average weekly wages of Prime drivers according to valid scientific methodology widely used in the field of forensic economics…………………………………….13

   III. Conclusion…………………………………………………………………..15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ............................................................. 3, 6, 8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................................... 14

*E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664 (8th Cir. 1992) ........................................... 2, 3, 5

*E.E.O.C. v. Dial Corp.*, 469 F.3d 735 (8th Cir. 2006) ............................................................ passim

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054 (8th Cir. 2002) ....................................................... 1, 7, 12

*Hopper v. M/V UBC Singapore*, No. H-09-1223, 2010 WL 2787806 (S.D. Tex. Jul. 14, 2010) ................................................................................................................................. 2

*King v. Staley*, 849 F.2d 1143 (8th Cir. 1988) ........................................................................... 2, 5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 14

*Osment Models, Inc. v. Mike's Train House, Inc.*, No. 2:09-cv-04189-NKL, 2010 WL 4721223 (W.D. Mo., Nov. 15, 2010) ........................................................................................ 12

*Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974) ................................................... 3

*Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006) .................................................. 1

*Scardina v. Maersk Line, Ltd.*, No. CIV.A. 00-1512, 2002 WL 1585566 (E.D.La. Jul. 15, 2002) ................................................................................................................................. 2

*Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976) ........................................... passim

*U.S. v. City of Warren, Mich.*, 138 F.3d 1083 (6th Cir. 1998) ....................................................... 11

*Wells v. Meyer's Bakery*, 561 F.2d 1268 (8th Cir. 1977) ...................................................... passim

*Young v. Brand Scaffold Services, LLC*, No. 1:07-CV-917, 2009 WL 4674053 (E.D. Tex. Mar. 16, 2009) ............................................................................................................................. 2

I. INTRODUCTION

The EEOC named Robert LaJeunesse, Ph.D. ("LaJeunesse") as its expert on damages, and LaJeunesse subsequently submitted a report and provided testimony about the amount of back pay due to the victims of Prime's unlawful discrimination. Prime submitted its Motion to Exclude Proposed Expert Testimony of Robert M. LaJeunesse, Ph.D., on June 30, 2014. "[R]ejection of expert testimony is the exception rather than the rule." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quoting FED. R. EVID. 702 advisory committee's note). "Expert testimony is admissible if it is reliable and will help the jury understand the evidence or decide a fact in issue. . . . Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1060-61 (8th Cir. 2002) (internal quotations and citations omitted). LaJeunesse's report and testimony are reliable and supported by relevant evidence as well as Title VII and Eighth Circuit law on calculating back pay. He performed his calculations in accordance with accepted methods in the field of forensic economics, and his report and testimony will be valuable to the fact finder in determining the amount of back pay that should be awarded to the victims in this case. Therefore, LaJeunesse's report and testimony are admissible, and Prime's Motion should be denied.

II. ARGUMENT

    A. **LaJeunesse properly calculated victims' back pay damages by considering victims' work histories during the mitigation period and adjusting the estimates accordingly.**

        1.     Victims' work histories prior to their application to Prime are irrelevant to back pay damages.

Prime objects to LaJeunesse's report and testimony as speculative and irrelevant, claiming that he "ignored the claimants' work histories . . . prior to . . . their applications to

1

Prime" in calculating their back pay damages. (Def.'s Sugg. Supp. Mot. Excl. LaJeunesse 5, ECF No. 273 (hereinafter "Def.'s Sugg.")). This objection is illogical given that a victim's work history prior to her application to Prime, and therefore prior to the discriminatory event, is irrelevant to the calculation of back pay in this case. Back pay is calculated "on the basis of what she would have earned absent the discrimination, less any amount she could have earned in mitigation." *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) (citing *King v. Staley*, 849 F.2d 1143, 1144-45 (8th Cir. 1988)). *See also* 8TH CIR. MODEL CIV. JURY INST. § 5.70 (explaining how juries should calculate discrimination victims' back pay). Moreover, Prime's expert did not take into account any victims' prior work histories in calculating their "earnings differentials," although he improperly speculated about victims' tenure at Prime using other factors. (Pl.'s Sugg. Supp. Mot. Excl. Mullins 20-24, ECF No. 276).

Prime cites three cases to support its contention that LaJeunesse should have taken victims' prior work histories into account in calculating back pay. (Def.'s Sugg. 4-5). These cases do not involve calculating back pay in Title VII cases, but rather loss of future earnings or front pay in personal injury cases. *See Young v. Brand Scaffold Services, LLC*, No. 1:07-CV-917, 2009 WL 4674053 (E.D. Tex. Mar. 16, 2009) (plaintiff in a negligence action claimed loss of future earnings due to workplace injury and presented an expert who calculated plaintiff's non-injury earning capacity); *Scardina v. Maersk Line, Ltd.*, No. CIV.A. 00-1512, 2002 WL 1585566 (E.D.La. Jul. 15, 2002) (plaintiff seaman injured on ship claimed loss of future earnings and presented an expert who calculated plaintiff's projected annual earnings); *Hopper v. M/V UBC Singapore*, No. H-09-1223, 2010 WL 2787806 (S.D. Tex. Jul. 14, 2010) (plaintiff brought wrongful death action against husband's employer after husband died in workplace accident and presented an expert who calculated husband's lost future income). A victim's past work history

2

may be relevant when calculating lost *future* income in personal injury cases, but Prime cites no authority for the proposition that a victim's work history prior to the discriminatory event should be considered when calculating her *back pay* in a Title VII case.

"[T]he purpose of Title VII [is] to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). Each victim applied to Prime and was deemed qualified by Prime, but was discriminatorily refused employment based on her sex. Once victimized by discrimination, she is entitled to the presumption that she would have begun *and* continued working for Prime. "There is a strong presumption that an employee who has suffered discrimination should receive back pay." *E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 743 (8th Cir. 2006); *accord*, *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992). Prime may present evidence to attempt to overcome this presumption, but if Prime cannot carry its burden, the victim is entitled to back pay from the time the discrimination occurred through the end of the trial. *See Dial*, 469 F.3d at 743 ("Women who were not hired… suffered losses as a consequence, and Dial did not overcome the presumption in favor of awarding back pay in respect to these claimants."); *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 258 (5th Cir. 1974) (back pay ends for most victims on the date the trial court issues a judgment finding discrimination, although factual circumstances may limit the period for some).

Prime suggests that the EEOC's expert should carry Prime's burden to rebut the presumption that the victims are entitled to full back pay based on what they would have earned working for Prime from the date of application to the date of trial. It further suggests that the victims of Prime's unlawful discrimination should be awarded less back pay if they did not have stable, continuous employment before they applied at Prime. These suggestions are improper and

3

do not have any bearing on the admissibility of LaJeunesse's report or testimony. LaJeunesse's calculations follow Title VII law in giving weight to the presumption that the victims of discrimination are entitled to be made whole. Moreover, they are reliable because he did not speculate about whether the victims would have continued working for Prime during the back pay period based on irrelevant information about victims' work histories prior to the discrimination. His report and testimony are admissible.

### 2. Victims' work histories during the mitigation period are relevant, and LaJeunesse properly accounted for them in his back pay calculations.

Despite Prime's allegation that he failed to do so, LaJeunesse does consider each victim's individual work history *subsequent to* her application at Prime. He subtracts each victim's earnings since she applied to Prime from what she would have earned at Prime had she not been discriminated against. *See Dial*, 469 F.3d at 744 ("the well established rule for calculating back pay [is] the difference between the amount the claimant would have earned absent the discrimination and the amount of wages actually earned during the relevant period"). Each victim's back pay was adjusted when there was evidence in the record that she fully mitigated, voluntarily withdrew from the labor force, or quit a mitigating job for personal reasons. (Ex. 1, LaJeunesse Dep. 118:19-24, 207:2-8, 207:24-208:3, 220:10-13). LaJeunesse thus took into account each victim's work history after she applied to Prime. In fact, Prime's expert adopted LaJeunesse's mitigation calculations without hesitation, finding them "completely reasonable and completely appropriate." (Ex. 4, Mullins Dep. 112:23-113:2).

LaJeunesse made these mitigation calculations in the interest of presenting a credible and reliable report that will be helpful to the finder of fact. However, that does not negate the burden of proof Prime will have to carry at trial. It will be up to the fact finder to determine whether Prime proves any amounts should be deducted from the victims' back pay, keeping in mind that

4

"ambiguities in what an employee or group of employees would have earned but for discrimination should be resolved against the discriminating employer." *Wells v. Meyer's Bakery*, 561 F.2d 1268, 1273 (8th Cir. 1977) (quoting *Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976)). LaJeunesse's report and testimony will be valuable to the fact finder because he properly calculated the victims' back pay according to "the well established rule," *Dial*, 469 F.2d at 744, taking victims' work histories into account where appropriate. His report and testimony are relevant, non-speculative, and admissible.

### B. LaJeunesse properly declined to consider statistics about Prime's PSD program participants in calculating victims' back pay damages.

Prime's next criticism is that "LaJeunesse assumes, without any support, a 100% success rate for the PSD [(Prime Student Driver)] program and the CDL test." (Def.'s Sugg. 6). This criticism is itself without support, as Prime cites no case law or other authority for the proposition that LaJeunesse's assumption makes his report or testimony inadmissible. In fact, LaJeunesse's assumption is clearly supported by Title VII and Eighth Circuit law on the proper method of calculating back pay. "Once the trial court [finds] unlawful sex discrimination in violation of Title VII, there [is] a strong presumption that [the plaintiff is] entitled to a back pay award on the basis of what she would have earned absent the discrimination, less any amount she could have earned in mitigation." *Delight Wholesale*, 973 F.2d at 670) (citing *King*, 849 F.2d at 1144-45); *see also* 8TH CIR. CIV. JURY INST. § 5.70 (explaining how juries should calculate back pay in Title VII cases). To speculate that any victim would not have completed Prime's PSD program simply based on unverified statistics provided by Prime[1] would be to give Prime the

---

[1] (Pl.'s Sugg. Supp. Mot. Excl. Mullins 4-5 (stating that Prime's Director of Technology, Rodney Rader, provided these statistics to Prime's expert witness, Mullins, and Mullins did not verify the statistics before using them to reduce his calculations of victims' "earnings differentials")).

5

benefit of its unlawful discrimination. Moreover, any statistics about Prime's PSD "pass rates" were based primarily on male drivers, since Prime's discriminatory policy prevented most women from accessing the PSD program. (Pl.' Sugg. Supp. Mot. Excl. Mullins 11 n.6). LaJeunesse correctly determined that it would be inappropriate to apply those statistics to female victims because there was no evidence that women would have the same "pass rates" as men. "[A]mbiguities in what an employee or group of employees would have earned but for discrimination should be resolved against the discriminating employer." *Wells*, 561 F.2d at 1273 (quoting *Stewart*, 542 F.2d at 452).

Reducing all of the victims' back pay calculations by a hypothetical average "pass rate" (Pl's Sugg. Supp. Mot. Excl. Mullins 11-13, 21-22) would be in direct opposition to the "make-whole" objective of Title VII. *See Wells*, 561 F.2d at 1272 (quoting *Albemarle*, 422 U.S. at 421). No driver actually employed by Prime has earned only three-fourths of his or her actual wages due to the possibility that he or she would have failed the PSD program. (*See* Def.'s Sugg. 6 (stating that just over one-fourth of PSD students fail or drop out of the program and arguing that back pay determinations should be "discounted" by that probability)). Drivers either pass or fail, and if they pass, they are entitled to their full wages. The victims in this case were not given the opportunity to pass the PSD program because Prime discriminated against them. They are therefore entitled to the presumption that they would have passed, and they are entitled to back pay that compensates them for their actual lost wages. *See Albemarle*, 422 U.S. at 421 ("given a finding of discrimination, backpay should only be denied for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination . . . and making persons whole"). LaJeunesse's decision not to discount victims' back pay calculations based on hypothetical averages gives weight to these presumptions and avoids improper speculation.

6

Moreover, LaJeunesse did take into account evidence of specific victims' ability or willingness to obtain employment as truck drivers. Where the record showed that a victim quit other trucking jobs for testing failures, accidents, or personal reasons, LaJeunesse adjusted her back pay. (Ex. 1, LaJeunesse Dep. 118:19-24, 206:11-19, 220:10-13). Prime conceded that these calculations are reasonable because its own expert adopted these calculations in his own report. (Ex. 5, Mullins Rep. 7; Ex. 4, Mullins Dep. 112:23-113:2). "Unrealistic exactitude is not required" in calculating back pay. *Wells*, 561 F.2d at 1273 (quoting *Stewart*, 542 F.2d at 452). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (internal quotations and citations omitted). Prime's criticisms go to the factual basis of LaJeunesse's assumptions and calculations, and therefore do not render LaJeunesse's report or testimony inadmissible. LaJeunesse properly applied facts from the record rather than speculating about victims' ability to pass the PSD program based on unverified statistics derived from male comparators. Further, his calculations stay true to the make-whole purpose of Title VII by presuming the victims are entitled to back pay. His report and testimony are relevant, non-speculative, and admissible.

### C. LaJeunesse properly declined to consider Prime's turnover rates in calculating victims' back pay damages.

Prime next argues that LaJeunesse should have reduced victims' back pay totals by either Prime's actual driver attrition rates or by attrition rates in the trucking industry generally. (Def.'s Sugg. 6-9). The attrition rates used by Prime's expert are based primarily on male truck drivers. (Ex. 4, Mullins Dep. 60:17-61:20). It would be inappropriate to apply the attrition rates of male truck drivers to female victims of sex discrimination. Moreover, applying any statistical attrition rate would be just as speculative and improper as applying a hypothetical "pass rate," as

discussed above. Title VII demands that victims of discrimination be made whole. *Albemarle*, 422 U.S. at 417-18. As a result, victims of discrimination are entitled to a presumption of back pay and "ambiguities in what an employee or group of employees would have earned but for discrimination should be resolved *against the discriminating employer*." *Wells*, 561 F.2d at 1273 (quoting *Stewart*, 542 F.2d at 452). Prime ignores Eighth Circuit and Title VII law by arguing that victims' back pay awards should be reduced based on male drivers' attrition rates, just as it ignored the law when it discriminated against these victims because of their sex.

Prime mischaracterizes LaJeunesse's methodology by stating that "[t]hroughout his Report, Dr. LaJeunesse treats the claimants as a group and applies the same methodology or statistics to all claimants." (Def.'s Sugg. 8). To the contrary, though he does apply his methodology uniformly, LaJeunesse treats each victim as an individual throughout his calculations. (Ex. 1, LaJeunesse Dep. 120:23-24 ("I calculated damages for specific individuals")). He made a number of adjustments to each victim's back pay calculations based on her own testimony and which reflect her own personal situation. (Ex. 2, LaJeunesse Rep. 2-4 (explaining how calculations reflect each victim's individual losses), 7-9 (showing each victim's individual loss calculations); Ex. 1, LaJeunesse Dep. 159:3-11 (stating that he used victims' depositions to inform his calculations), 238:23-239:7 (disparities between claimants' back pay amounts are based on their unique personal circumstances)). Because LaJeunesse calculated victims' back pay on an individual basis and did not treat them as a class in which the victims are indistinguishable from one another, his decision to adjust their back pay calculations according to their individual work histories rather than general statistics about driver attrition is fully justified.

8

It is true that in a "group" claim such as LaJeunesse refers to in his deposition (Ex. 1, LaJeunesse Dep. 120:1-19, *see also* Def.'s Sugg. 8), turnover rates may be considered as an alternative to mitigation because it is impossible or impractical to determine each class member's individual mitigation efforts, work history, or other necessary facts. *See Wells*, 561 F.2d at 1275 (when an individualized calculation of back pay is impossible, class-wide calculation methods become necessary). However, in this case, both experts calculated damages for each individual victim based upon her unique situation, rather than calculating a general, class-wide damages estimate. (Ex. 2, LaJeunesse Rep. 3-4, 7-9; Ex.1, LaJeunesse Dep. 120:20-121:2, 238:23-239:7; Ex. 5, Mullins Rep. 5-7, 11-49). Even the Dept. of Labor Directive 310 cited by Prime (Def.'s Sugg. 8) and discussed during LaJeunesse's deposition (Ex. 1, LaJeunesse Dep. 128:17-132:23) distinguishes between calculating individual relief and calculating what it calls "formula relief." (Ex. 1, LaJeunesse Dep. Ex. 5, Office of Fed. Contract Compliance Programs, Dept. of Labor, *Calculating Back Pay as a Part of Make-Whole Relief for Victims of Employment Discrimination*, Jul. 17, 2013, *available at* http://www.dol.gov/ofccp/regs/compliance/directives/dir310.htm). "Formula relief is a way of approximating losses in circumstances in which it is unrealistic to attempt to compute individual losses with accuracy." *Id.* at 5. Since we have sufficient data in this case to calculate individual losses accurately, formula relief would not be appropriate. *Cf. Wells*, 561 F.2d at 1275 (when an individualized calculation of back pay is impossible, class-wide calculation methods become necessary). LaJeunesse recognized this by using individual calculations rather than class-wide formula relief methodologies in preparing his report and testimony.

In discussing formula relief, DOL Directive 310 goes on to explain that "[i]n hiring cases, workers are entitled to a presumption of continuous employment that runs through the end date

9

of potential liability." (Ex. 1, LaJeunesse Dep. Ex. 5, at 8 (citing *Dial*, 469 F.3d 735)). It then explicitly states that "OFCCP will follow that presumption when considering the expected tenure of workers who were not hired due to discrimination . . . ." *Id.* It thereby distinguishes failure to hire cases, where attrition is *never used*, from other cases where attrition might be applied as part of the formula relief. Therefore, the Directive does not support the proposition that attrition should be taken into account in this failure to hire case, as Prime mistakenly argues.

In addition to DOL Directive 310, Prime cites two articles which it claims support the proposition that attrition should be taken into account in this case. (Def.'s Sugg. 7); *see* Paul F. White, Josefina V. Tranfa-Abboud, & Fredrick M. Holt, *The Use of Attrition Rates for Economic Loss Calculations in Employment Discrimination Cases: A Hypothetical Case Study*, 16(2) J. FORENSIC ECON. 209 (2003) (Def.'s Sugg. Ex. E); Charles L. Baum II, *Employee Tenure and Economic Losses in Wrongful Termination Cases*, 24(1) J. FORENSIC ECON. 41 (2013) (Def.'s Sugg. Ex. F). Even a cursory reading of the White, *et al.*, article reveals that it is specifically discussing *wrongful termination* claims. *See* White, *et al.*, *supra*, at 209 (discussing "failure to promote or wrongful termination" claims), 209-210 (discussing forensic economics literature on "damage calculations for wrongful termination litigations"), 211 ("the analysis presented in this paper is a hypothetical case study of a single-plaintiff wrongful termination case"). The very title of the Baum article, "Employee Tenure and Economic Losses in *Wrongful Termination* Cases" (emphasis added), reveals the same. Baum, *supra*, at 41. These articles are not applicable to failure to hire cases such as this one. Even the DOL Directive that Prime cites makes clear that in failure to hire cases, victims are entitled to the presumption that they would have begun and continued working for the discriminating employer. (Ex. 1, LaJeunesse Dep. Ex. 5, at 8 (citing *Dial*, 469 F.3d 735)). Prime has cited no Eighth Circuit authority for the proposition that attrition

10

should be taken into account in calculating back pay for victims in this failure to hire case,[2] and in fact such a proposition is against the weight of Eighth Circuit law. *See Dial*, 469 F.3d at 744 (holding that the district court did not err in refusing to consider attrition statistics when calculating the victims' back pay because it "applied the well established rule for calculating back pay" which was "consistent with Title VII's dual purposes of compensating victims and deterring future discrimination."). As such, LaJeunesse's decision to calculate each victim's back pay based on facts in the record rather than hypothetical statistics is proper, and his report and testimony are admissible.

### D. LaJeunesse properly calculated the value of victims' lost fringe benefits according to valid statistics and methodology widely used in the field of forensic economics.

LaJeunesse relied upon statistics from the Bureau of Labor Statistics to estimate the value of fringe benefits that the victims lost as a result of being discriminated against by Prime. Using Bureau of Labor Statistics figures to estimate the value of fringe benefits is a valid and accepted method in the field of forensic economics. (Ex. 3, 2d LaJeunesse Decl. ¶ 6); s*ee also* Gerald D. Martin & Marc A. Weinstein, DETERMINING ECONOMIC DAMAGES §§ 410, 414 (Rev. 24, 2012) (statistics from the Bureau of Labor are "acceptable in court" and can be used to value benefits). In fact, Prime's own damages expert, who is also a forensic economist, testified that he has used

---

[2] The two cases cited by Prime (Def.'s Sugg. 7) are not mandatory authority in the Eighth Circuit. Moreover, in *U.S. v. City of Warren*, a disparate impact case, the Sixth Circuit ruled that limiting the victim's back pay period *and* reducing the back pay amount by attrition rates "amounts to double-counting, an improper application of the law and therefore an abuse of discretion." *U.S. v. City of Warren, Mich.*, 138 F.3d 1083, 1097 (6th Cir. 1998). In this case, LaJeunesse limited the victims' back pay periods as necessary according to evidence in the record, so further reducing victims' back pay amounts by attrition rates would be improper.

11

the same statistics when calculating the value of fringe benefits in other cases. (Ex. 4, Mullins Dep. 74:15-19).

Though Prime contends that LaJeunesse should have used the "actual factual data provided by Prime" to calculate the value of fringe benefits (Def.'s Sugg. 10), LaJeunesse determined that he did not have sufficient data to calculate the value of the benefits. (Ex. 3, 2d LaJeunesse Decl. ¶ 5). The payroll data LaJeunesse received reflected only what employees themselves had deducted from their paychecks for these benefits. *Id.* The data did not show Prime's monetary contributions to any employee benefits, hence it did not reflect the true cost of the premiums or the value of the benefits. *Id.*, s*ee also Dial*, 469 F.3d at 744 (upholding the district court's award of "the amount of the health care premiums that would have been part of their employment package had they not suffered discrimination"). LaJeunesse examined all of the available evidence and decided, based on his expertise, that the Bureau of Labor Statistics figures were a better representation of the total value of fringe benefits for Prime employees, so he used those figures in his calculations. (Ex. 3, 2d LaJeunesse Decl. ¶ 7).

Prime's contention that the Bureau of Labor Statistics figures overstated the value of fringe benefits does not render LaJeunesse's report and testimony inadmissible. "Defendant's contrary interpretation of the evidence upon which [the expert] relied does not bear upon the admissibility of [the expert's] opinions." *Osment Models, Inc. v. Mike's Train House, Inc.*, No. 2:09-cv-04189-NKL, 2010 WL 4721223 at *2 (W.D. Mo., Nov. 15, 2010). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility. . . . Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hartley*, 310 F.3d at 1061 (internal quotations and citations omitted). LaJeunesse's opinion is not "fundamentally unsupported." *Id.*

12

In fact, it is likely that the Bureau of Labor Statistics data underestimates the actual value of the victims' lost fringe benefits. Martin & Weinstein, *supra*, at § 414. LaJeunesse used a scientifically valid method of calculating fringe benefits based on statistics that are widely used in the field of forensic economics, so his testimony is relevant, reliable, and admissible.

> **E. LaJeunesse properly calculated the gross average weekly wages of Prime drivers according to valid scientific methodology widely used in the field of forensic economics.**

Prime cites Rodney Rader's testimony (Def.'s Sugg. 11-13, Def.'s Sugg. Ex. J) to refute the validity of LaJeunesse's calculations. As a threshold matter, Rader is not a statistician or an economist, so he is not qualified to render an admissible opinion about the validity of LaJeunesse's methodology. Even assuming, *arguendo*, that Rader is qualified to offer criticism of LaJeunesse's methodology, this criticism is flawed in a number of ways. First, his example is fictitious and does not reflect actual data from the sample. It cannot therefore reflect any actual result of LaJeunesse's calculations. Second, though Rader's example shows a hypothetical situation in which a higher gross pay is counted in the average more times than the lower gross pay, it is just as likely in the actual data set that periods of lower gross pay were factored in more times than the periods of higher gross pay, therefore resulting in an *understatement* of the true average. (Ex. 3, 2d LaJeunesse Decl. ¶ 9 ("simply reversing the 'Gross Pay' amounts in his hypothetical… would reverse his conclusion.")). Finally, Rader's criticism exposes his fundamental misunderstanding of the law of large numbers. The result in the very small fictitious example given does not reflect the results in a very large sample size where thousands of pay periods are averaged together. As more data is included in the sample size, the closer the average comes to reflecting the "true" average of the population. (Ex. 3, 2d LaJeunesse Decl. ¶ 9). Because LaJeunesse's calculations are based on five years of payroll data for over 6,000 drivers,

13

his averages are accurate within a reasonable margin of error. (Ex. 3, 2d LaJeunesse Decl. ¶¶ 9, 11). "Unrealistic exactitude is not required" in calculating back pay. *Wells*, 561 F.2d at 1273 (quoting *Stewart*, 542 F.2d at 452).

The same principle holds true for LaJeunesse's calculations averaging the payroll of all the drivers in the data sample rather than somehow controlling for drivers' experience level prior to their employment at Prime. In fact, LaJeunesse could not have controlled for that variable in the manner that Prime suggests because he was not provided with data about drivers' experience prior to their tenure at Prime. (Ex. 3, 2d LaJeunesse Decl. ¶ 10). Likewise, there is no evidence in the record that Prime's expert accounted for drivers' pre-Prime experience levels when he calculated his average weekly wages, nor that he was given information about the drivers' experience levels at the time of their hiring. (*See* Ex. 5, Mullins Rep. 4). Nevertheless, LaJeunesse did ensure that his data sample did not over-represent drivers with a great deal of experience. He calculated that the drivers in the sample earned about 22.9 cents per mile on average. In fact, Prime pays its B seat drivers 12 cents per mile, and it pays first-year A seat drivers 34 to 36 cents per mile, depending on the type of truck. (Ex. 6, Mileage Rates Paid to Prime Drivers). This average therefore indicates that the majority of drivers in the sample had very little driving experience and are comparable to the victims in this case. (Ex. 2, LaJeunesse Rep. 3; Ex. 3, 2d LaJeunesse Decl. ¶ 10). By checking his calculations in this manner, LaJeunesse used "the same level of intellectual rigor that characterizes the practice of an expert in [his] field," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), to ensure that his testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 141 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). As such, his report and testimony are admissible.

14

### III. CONCLUSION

LaJeunesse's report and testimony are relevant, reliable, and properly calculate back pay in accordance with Title VII and Eighth Circuit case law. His report and testimony are therefore admissible under Fed. R. Evid. 702. For those reasons, and all of the reasons stated above, the EEOC respectfully asks this Court to deny Prime's Motion to Exclude Proposed Expert Testimony of Robert M. LaJeunesse, Ph.D., and to admit Dr. LaJeunesse's report and testimony at trial.

Respectfully Submitted,

/s/ Dayna Deck
Dayna Deck
Senior Trial Attorney
EEOC-Kansas City Area Office
Gateway Tower II
400 State Ave., Suite 905
Kansas City, KS 66101
(913) 551-5848 / (913) 551-6957 (fax)
dayna.deck@eeoc.gov

**CERTIFICATE OF SERVICE**

       I hereby certify that on July 24, 2014, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the Western District of Missouri, with notice of same being electronically served by the Court, addressed to:

Joanne Spears Jackson
Polsinelli Shughart PC
901 E. St. Louis Street, Suite 1200
Springfield, MO 65806
jjackson@polsinelli.com

James C. Sullivan
Polsinelli Shughart PC
Twelve Wyandotte Plaza
120 W. 12th Street, Suite 1600
Kansas City, MO 64105
jsullivan@polsinelli.com

Attorneys for Defendant New Prime, Inc.

Paul O. Taylor
Taylor & Associates, Ltd.
900 W. 128th Street, Suite 104
Burnsville, MN 55337
trucklegal@aol.com

Jennifer Kyner
Kyner Law PC
4800 Rainbow Blvd., Suite 200
Westwood, KS 66205-1935
jkyner@kynerlaw.com

Attorneys for Plaintiff-Intervenor Clouse

                                                /s/ Dayna Deck