**IN THE UNITED STATES DISTRICT COURT FOR THE**

**WESTERN DISTRICT OF MISSOURI**

**SOUTHERN DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | ) | |
| COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:11-CV-03367-MDH |
| v. | ) | |
| | ) | |
| NEW PRIME, INC., d/b/a PRIME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

On March 9, 2015, the Court entered its Order Appointing Special Master which appointed the undersigned as a Special Master in this case for the purpose of determining the availability and amount of any back pay due to the Claimants in this case. The Special Master conducted a hearing in the matter to receive testimony from four expert witnesses, and received other evidence in the form of transcribed depositions of those witnesses and some of the Claimants and other documentary evidence. After the hearing, the evidence was closed, subject to the receipt of electronic "thumb drives" from the parties containing their exhibits, which have now been received by the Special Master and are delivered to the Court herewith.

The Claimants in this matter consist of 63 women who applied for driving positions with the Defendant and were placed on a waiting list, a practice which the Court found to be discriminatory based on the gender of the applicants. That number consists of two different groups of applicants; those who were a part of the original group, and those who were added later by the Equal Employment Opportunity Commission (EEOC), which has provided representation for the Claimants. The original Claimant, Deanna Clouse, settled her complaint with the Defendant. Five other Claimants (Susan

Whitehouse, Shakila Jackson, Carolyn Bartels, Melissa Parker and Monique Harriott) were dropped from the case by the EEOC.

## Part I:  Description of Methodology Used by Experts

Without minimizing the incredible amount of work that has been devoted to this case by the parties, their attorneys and staff and their experts, both of the primary experts, Dr. Robert LaJeunesse for the Claimants (Exhibit 69) and Dr. Steven Mullins for the Defendant (Exhibit G), used the following five-step approach to determine their back pay recommendations:

1. Determine, for each Claimant, the appropriate "start date" for back pay, and the mitigation date, or "end date", for back pay eligibility (to ascertain the back pay period, most often expressed by a number of quarters of the year).

2. Determine the value of the "but-for" earnings at Prime, or the amount that each Claimant would have earned at Prime but for the discriminatory hiring practice as declared by the Court.

3. Determine the actual earnings that each Claimant earned or could have earned during the back pay period, and determine whether an appropriate multiplier for the fringe benefits of such other employment should be applied.

4. Offset actual earnings during the back pay period against but-for earnings at Prime to derive a specific amount of back pay for consideration as evidence in this case.

5. Determine whether and to what extent to apply present value, interest and tax offset adjustments to the back pay, and for some Claimants, to determine whether and to what extent to grant additional relief for out-of-pocket expenses incurred by Claimants.

## Part II:  Variations of Experts' Approaches

That five-step approach seems relatively easy.  The experts' conclusions differed greatly in result through the application of competing strategic factors, with predictable results:  The 63 Claimants would

receive approximately $3,000,000.00 in total under the calculation of Dr. LaJeunesse. Eight different

Claimants would be entitled to back pay awards of over $80,000.00 each under the EEOC approach

(Exhibit 75). The Defendants would concede only a much lower number, and their final total number is

perhaps less than $400,000.00 according to their Appendix to Defendant's Prehearing Brief (Exhibit R).

Those Claimants had widely divergent fact situations requiring a time-intensive exploration for each

Claimant's back pay calculation, with the key element being the determination as to the appropriate cut-

off date for each Claimant.

The following describes how the application of those factors differed from expert to expert:

**1. But-for earnings (Projected earnings at Prime if hired)**

Dr. LaJeunesse used (for after completion of training wages) an analysis of all drivers of Prime

regardless of tenure or experience. Exhibit B, Deposition of Dr. LaJeunesse, page 152.

Dr. Mullins used earnings data for Prime Start drivers who entered the Prime Student Driver

program between January 2009 and August 2013 to determine the average weekly earnings (Exhibit G,

Table 1, page 7).

At Prime, upon completion of the Prime Student Driver program, drivers typically would be

assigned to an entry level or "second seat" position for a period of six to eight months, before

promotion to a lead or "first seat" position. The following reflects the average "but-for earnings" on a

<u>quarterly</u> basis for each year for a starting "second seat" driver, as propounded by the two experts:

|  | Dr. LaJeunesse | Dr. Mullins |
|---|---|---|
| 2008 | $8,920.00 | $8,338.00 |
| 2009 | $8,920.00 | $8,338.00 |
| 2010 | $9,260.31 | $7,944.00 |
| 2011 | $9,480.88 | $8,202.00 |
| 2012 | $9,625.25 | $8,474.00 |
| 2013 | $9,880.05 | $8,701.00 |

Note: All Claimants are being recommended for cut-off dates on or before December
31, 2013, so no extension of those numbers beyond 2013 is required.

Both experts accounted for the delay between application and completion of training. Dr. LaJeunesse indicated he reduced his first quarter earnings by 6 weeks in his calculations, although using a multiplier of 0.4615, he actually reduced first quarter earnings by 7 weeks. Coincidentally, that 6 weeks would have been the same as the 42 days which Dr. Mullins used from application to start date to calculate "but-for" earnings at Prime (see exception below for those Claimants who already had their Commercial Driver's License). Both experts also used their respective fringe benefit multiplier, LaJeunesse at 28% and Mullins at 16.4% for second seat drivers.

Upon promotion to the lead first seat position (Dr. Mullins apparently averaged the transition from second seat to first seat at 1.40 quarters, per Exhibit G, and further included in his calculations the transition quarter in which each Claimant would have made that change per his average number), the following numbers were used by the parties' experts:

|  | Dr. LaJeunesse | Dr. Mullins |
|---|---|---|
| 2008 | $11,417.60 | $13,161.00 |
| 2009 | $11,417.60 | $13,161.00 |
| 2010 | $11,853.18 | $12,402.00 |
| 2011 | $12,135.53 | $13,517.00 |
| 2012 | $12,320.31 | $13,331.00 |
| 2013 | $12,646.46 | $12,851.00 |

Both experts included their value of fringe benefits multiplier, Dr. LaJeunesse again at 28%, and Dr. Mullins at 19.1% for first-seat drivers.

Dr. Mullins' numbers also include an adjustment on both quarterly but-for earnings and interim earnings for "forgone interest and inflation," and he brought them to present value using Consumer Price Indexes and the yield on U.S. Government securities. Exhibit G, Table 3, page 11.

While the numbers in the Tables above vary, much of the disparity is due to Dr. Mullins' inclusion of the present value adjustment. He included in an present value calculation an interest factor in line with government securities' rates while Dr. LaJeunesse applied an interest rate at the end. The different fringe benefit factors also contribute to the variance. Dr. Mullins' choice of the drivers'

4

pay to include in his study (Prime drivers who entered their training program between 2009 and 2013 and then drove continuously for Prime through August 2013) also seemed more specific that Dr. LaJeunesse's choice (the payroll databases from 2009-2013 provided by Prime for all drivers).

Further, by including interest rate and present value numbers from the beginning, the process of coming to final calculations is simplified over the Dr. LaJeunesse report. The Recommendations below were based on a methodology which uses Dr. Mullins' calculations as to Claimants' "but-for" earnings at Prime. It is preferred for its more thorough approach, and, frankly, the ease of converting Dr. Mullins' chart numbers for each Claimant (Exhibit G) to a different eligibility period as determined herein.

### 2. Start Date for Back Pay

As stated above, Dr. LaJeunesse uses a start date for back pay which is 7 weeks after the date of application. Dr. Mullins uses a date after the application date to reflect the completion of the time necessary for the applicant to be approved and start and complete training, for which no compensation was paid to the applicant. That completion date depended largely on whether the applicant already had a Commercial Driver's License (CDL) at the time of application. For those with the CDL, Dr. Mullins assumed they would start their employment 14 days after application date. For those without the CDL, he assumed compensable employment would start 42 days after application date.

Because Dr. Mullins' approach considers the quicker training time for those with their CDL, the Special Master has used Dr. Mullins' start date determinations.

### 3. Attrition Rate

Dr. LaJeunesse applied no attrition rate to the individual Claimants, and assumed that 100% of those who entered CDL training program would have completed the program. Exhibit B, Deposition of Dr. LaJeunesse, pages 141-142.

Dr. Mullins applied a three-tiered attrition rate approach. Except for those Claimants who either already had their Commercial Driver's Licenses (CDL) prior to applying or who subsequently completed a

5

driver training program and earned their CDL (to whom he applied only the third attrition factor below), he applied attrition factors as follows: (1) based upon a "no-show for training rate" of 25% for the Prime Student Driver program, he applied a factor or 75% to cover the possibility that an applicant might not show for the training; (2) based upon a pass-rate of 73.7% for the Prime Student Driver program, he applied that factor to cover the possibility that a student who attended the program might not complete it successfully. Exhibit G, pages 8-9. For all Claimants, he applied a third attrition rate based on firm-specific data, ranging from 77.3% at end of year 2 to 15.6% at end of year 2. Exhibit G, Table 2, page 10.

The mitigation dates determined in this Report and Recommendation reflect an actual attrition rate. In the recommendations that follow, only 7 of 63 Claimants are determined to have more than one year or four quarters of eligibility for back pay. That represents a "virtual" attrition rate of 89% prior to the start of the start of the second year. Thus, only 11% have back pay eligibility at the end of year 1, while Dr. Mullins' "predicted" attrition rate approach would assume that 100% of CDL-holding applicants would still be employed and roughly 55% of non-CDL holders would still be employed after application of his "no-show" and "no-pass" rates. The virtual mitigation rate, which stems directly from factors which cut-off or mitigate back pay eligibility (such as pregnancy, taking care of a loved one, schooling, career change, and the like) seems to be a better, more reliable method of getting an attrition factor into the equation than Dr. Mullins' assumptions that these 63 Claimants would, across the board, follow the historic trends of training and employment at Prime. Indeed, the Claimants may argue that the Special Master's determination of mitigation dates was overly aggressive, given the disparity indicated above. Nonetheless, the mitigation dates do represent an actual attrition, and Dr. Mullins' approach would paint all of the Claimants with the same "attrition brush." Similarly, none of the 63 Claimants are determined to be eligible for back pay for more than 8 quarters or two years, reflecting an actual attrition rate of 100%, while Dr. Mullins' Table 2 would indicate that only 22.7% of the Claimants would have left Prime employment by the end of year 2 using his "average employment probabilities."

6

Dr. Mullins' three-tiered approach to attrition illustrates the real difficulty of applying average attrition rates to actual people. It allows Defendant to get two bites out of the attrition apple. Clearly, some of the Claimants, if actually hired, would have worked for Prime and might still be there. Others may have lasted less than a year with Prime. To apply the same rate of attrition to each Claimant is simply unfair, and using the fact-based mitigation date to determine actual attrition is, at the very least, preferable to Dr. Mullins' "one rate fits all" approach.

The articles relied upon by Defendant's experts emphasize the whole attrition rate discussion. The Baum and White articles both dealt with employment discrimination cases other than "failure to hire" cases such as these. In the White article, the very first sentence refers to cases of employment discrimination "such as failure to promote or wrongful termination." Exhibit M, page 1. In the Baum article, again the very first sentence makes reference to "wrongful employment termination cases." Exhibit N, page 1. Clearly, those types of claims are employee specific and do not have the element in this case of failure to hire.

Attrition rates within the trucking industry are very high and volatile. There is intense competition by companies within the industry to lure drivers both at the entry level and among experienced drivers (Exhibit DD and the more visible indicators on the nation's highways). Prime's recruitment material indicates the potential of becoming a "lease operator" and the ability to "set your own schedule for getting back home." Exhibit V. The ability of a company such as Prime to hire, train and then retain drivers in the midst of that intense competition is critical to Prime's success. But the "lease operator", or owner-operator status, where the driver owns his own truck and leases him/herself and his/her truck to the company, is a large part of the recruitment/retention pitch which companies like Prime must engage in to survive. Time after time, the Claimants' depositions revealed the big-money lure of the industry, which so often fell short of promises and led to the wild job-hopping so prevalent in the industry.

While Defendant's expert Ms. Voie testified that she was, perhaps only anecdotally, aware of studies within the industry which showed a lower attrition rate, or, in her words, "more loyalty", among female drivers than male driver, the firm and industry attrition rates provided by Defendant reflected only both-gender numbers. Drivers who moved within the same company from "employee" status to "owner-operator" status in a lease relationship likely had an impact on the attrition rate numbers, to the extent that the Recommendations will include a request for a specific finding that the attrition rates used by Dr. Mullins are based on speculation and are unreliable.

### 4. Mitigation Date or End Date for Back Pay

The EEOC assigned a mitigation date (Dr. LaJeunesse emphasizing that those decisions were generally made by "legal staff" at EEOC, and that he occasionally participated in that discussion) to reflect the end of back pay eligibility, and used end-of-quarter dates for terminations, regardless of when the termination date occurred within that quarter.

Dr. Mullins made no attempt to determine a mitigation date, and simply used in his calculations the mitigation date determined and provided by Dr. LaJeunesse. Deposition of Dr. Mullins, Exhibit F, pp. 112-113. He testified that the mitigation or cut-off date was a legal issue for the court, and that position required a lengthy case-by-case review of the available records to determine the appropriate cut-off dates for each Claimant. The parties have provided probably close to 10,000 pages of documentary evidence in this case. The parties organized those documents meticulously, making the selective review of documents fairly easy. Although the hours to produce this Report and Recommendation may appear high, the undersigned reviewed only such documents as were raised by the issues, and did not review every document.

In some cases, because of the imprecise nature of some of the testimony in the depositions (when a Claimant indicated that a certain event happened "in the middle" of the month or "sometime in

April" or a similar phrase), these Recommendations are based on a mid-month or mid-quarter date assigned by the Special Master, for an attempt at greater precision.

Defendant has the burden of proof on mitigation, and it did not meet its burden to establish any other date or dates than those established by the Special Master, and set forth in the recommendations.

**5**. **Calculation of "Quarters" of Back Pay eligibility:**

Dr. LaJeunesse, for both the start date and the end date, used the beginning of a quarter for whenever the start date happened, and the end of the quarter for whenever the end date occurred within that quarter. Thus, if a start date would have occurred for a Claimant on March 31 and an end date for the same Claimant on July 2 of the same year (a hypothetical), Dr. LaJeunesse would have concluded that that hypothetical Claimant would have been eligible for three quarters of back pay. Dr. Mullins determined a number of quarters by using, on the front end, the actual start date (application plus 12 or 42 days, depending on CDL status of the Claimant). Recall that he used Dr. LaJeunesse's end date, but left the actual end date as a legal issue for the Special Master and the Court.

Thus, while Dr. LaJeunesse's report contains only whole numbers for quarters of eligibility, Dr. Mullins' numbers frequently show the quarters in decimal fashion.

Claimant Naquita Price is a good example of the application in this way. Her start date of September 27, 2010, and her cut-off date of December 31, 2010, would entitle her to two quarters under Dr. LaJeunesse's chart, but only 1.05 quarters under Dr. Mullins method of applying the start date. Clearly, Dr. Mullins provides the more specific and preferred method, and it is used in the Recommendations herein.

On a larger scale, this effort was complicated by the hard lines that the parties took on mitigation dates, requiring the intensive review of depositions, when they existed, and reams of other documentary evidence. Clearly, the period of eligibility for each Claimant is the key component in the

back pay determination.  My attempt was to be as consistent as possible over the broad range of factors that took place within the lives of these Claimants.

###### 6.  Valuation of Fringe Benefits for "But-For" Earnings

Dr. LaJeunesse's used a 28% multiplier for "but-for" earnings at Prime, and based that upon industry-wide averages of "the economic value of fringe benefit," ultimately choosing a "more conservative" 28% to the 29% industry standard.   Exhibit B, Deposition of Dr. LaJeunesse, page 199.

Dr. Mullins used a factor which he described as an actual cost to Prime of the benefits, which was 16.4% for employees during the first year of employment, and 19.1% thereafter (the difference likely being in the value of a 401(k) plan only available to Prime employees after their first year of employment.  Exhibit G, page 8).

While the actual cost apparently does not include such factors as the value of workers' compensation benefits, the Special Master finds it more specific and more reliable than the "economic value" research of Dr. LaJeunesse, and will recommend below that the Court approve the calculations based on the actual cost of the fringe benefits.

###### 7.  Valuation of Fringe Benefits for Interim Earnings

For Claimants' actual earnings, used to offset "but-for" earnings at Prime, Dr. LaJeunesse placed a value on the fringe benefits, differing from claimant to claimant, but based on the industry in which each Claimant secured other offsetting earnings, and the nature of their employment (full- or part-time, for example).  Those values, for each Claimant with offsetting earnings, were applied to actual earnings by simply multiplying the actual earnings by the applicable fringe factor.  The factors ranged from 28%, apparently for those in the trucking industry, to as low as 10%, for those with no/low benefit employment, with other instances of the factor being set at either 14%, 15%, 20% or 25%.  Self-employment, in which some Claimants engaged, was not determined to have fringe benefits for valuation purposes.  On interim earnings, many of the Claimants, from the somewhat limited

information available to the Special Master, had any benefits for their other employment beyond the presumably automatic benefit of the employer's contribution of its share of Social Security and Medicare insurance.

Dr. Mullins indicated (Exhibit G, page 11) that, in adopting Dr. LaJeunesse's interim earnings records and the fringe benefit rates that Dr. LaJeunesse applied, that those numbers were reasonable. Thus, Dr. Mullins capped the fringe benefit rates on the "but-for earnings" at Prime at 16.4% and 19.1%, depending on length of service there. By simply adopting Dr. LaJeunesse's numbers on interim earnings, he used a higher relative fringe benefit rate for interim earnings than he did for the earnings that would have been made at Prime. This approach punishes the Claimants by increasing the offsetting interim earnings. As we will discuss later, he also applied a present value factor on top of the LaJeunesse number. Thus, while, Dr. Mullins questioned Dr. LaJeunesse for his choice of the economic value of fringes on "but-for" earnings at Prime (reducing to actual cost, at 16.4% or 19.1% or earnings from Dr. LaJeunesse's 28%), he adopted Dr. LaJeunesse's economic value on mitigating earnings.

This inconsistent approach to fringe benefit valuation by Dr. Mullins favors Defendant in both ways, by lowering the fringe value on but-for earnings, and by leaving the fringe value high on mitigating or offsetting earnings. The Special Master engaged in a brief but interesting mathematical endeavor to determine how to adjust Dr. Mullins' "Actual Earnings plus benefits" to ensure a uniform approach for both but-for earnings and mitigating earnings. Complicating the matter, both experts applied, in some cases, (for Claimants Labrew, Poe, Hooper, Pasteur, Smith, Elston, Knapp, Martin, Mayder, Davis, Myles, Sudderth and Moss) different fringe benefit factors to different employment within the mitigating period. For the purposes of this modification, the Special Master chose the predominant factor for each Claimant within the qualifying period.

On the but-for earnings side, Dr. Mullins' "actual cost of fringe benefit" percentage of 16.4% (while it was 19.1% for those employed at Prime longer than a year, the Special Master is using the first-

Case 6:11-cv-03367-MDH   Document 365   Filed 08/31/15   Page 11 of 42

year 16.4% as less than 30% of the Claimants were determined to have a qualifying period of more than one year) is about 60% of Dr. LaJeunesse's "economic value of fringe benefit" percentage of 28%. The Special Master has chosen to apply that 60% to each of the various factors used by Dr. LaJeunesse on the mitigated earnings side, and this reduced the factors as follows: 28% to 16.8%, 25% to 15%, 20% to 12%, 15% to 9%, 14% to 8.4%, and 10% to 6%. The latter percentage roughly approximates the amount paid by any employer as the employer's share of Social Security and Medicare, a typical "no benefit" situation which many Claimants experienced.

However, translating those lower percentages, applied to all mitigating earnings except for self-employment and imputed wages, into an adjustment to be applied to Dr. Mullins' actual earnings produced a calculation which some might view as time-intensive. In consideration of that, the Special Master chose to use the actual earnings of each Claimant, as shown on Dr. LaJeunesse's charts (which were primarily derived from W-2 or other wage documents). Applying those reduced fringe benefit modifiers for each Claimant produced an acceptable estimation of each Claimant's actual offsetting earnings plus fringe benefits.

For the entire class of Claimants, this approach had the result that the mitigated earnings overall were reduced significantly. The failure to engage in this endeavor would have punished the Claimants for the inconsistent application of a fringe benefit factor as between but-for earnings, which work to increase their back pay awards, and mitigating earnings, which serve to reduce their back pay awards.

### 8. Interim earnings—application of present value

While it is somewhat difficult to de-cipher the formulas contained in Dr. LaJeunesse's calculations, it seems that he used no present value calculations in his back pay determinations. Instead, he applied an interest rate modifier for each quarter of back pay eligibility.

As mentioned earlier, Dr. Mullins applied a present value factor to both "but-for" earnings at Prime and to the Claimants' actual, offsetting earnings. Conceptually, as it relates to mitigating

12

earnings, this approach seems erroneous. The present value adjustment which Dr. Mullins applied to the Claimants' but-for earnings is appropriate because that adjustment reflects the present value of a monetary amount, i.e. their pay and benefits, that they never received. Applying a present value factor, however, to their mitigating earnings is inappropriate because it adjusts to a higher number their mitigated earnings, which were received at the time of their employment, and likely consumed. That approach by Dr. Mullins punishes the Claimants, and must not be followed by the Court. The Special Master averted the lengthy process of "backing out" the present value adjustment in Dr. Mullins' numbers (each Claimant with a different time period had a different present value calculation), by using the actual earnings numbers more clearly shown on Dr. LaJeunesse's charts, then applying the modified fringe benefit factor as set forth in paragraph 7 above.

**9. Interest Offset**

In his initial report, dated December 13, 2013, Dr. LaJeunesse used an "Interest Offset" table to reflect the "erosion of purchasing power on lost earnings". Exhibit A, page 5. The rates shown in that table are the "average annual market yield on U. S. Treasury securities at 1-year constant maturity". In a subsequent report, Dr. LaJeunesse urges that a more reasonable interest rate would be that reflected in the IRS underpayment tax penalty. He then applied that rate, and compounded the interest quarterly. Exhibit C, page 5.

In Davis v. Kansas City Housing Authority, 822 F. Supp. 609 (W. D. Mo. 1993), the Court found that the appropriate rate of interest to calculate damages is the statutory rate used for post-judgment interest. That statutory rate is contained in 28 U.S.C. Sec. 1961, and described as a rate equal to the "weekly average 1-year constant maturity Treasury yield." That is the rate used by Dr. Mullins in his present value adjustment to "but-for" earnings. While it is a fair conclusion that the "average market yield" on U. S. Treasury securities is a manipulated interest rate that bears no relationship to real life, it is the appropriate rate. Further, since it is already included in the "but-for" earnings numbers calculated

by Dr. Mullins, no additional inclusion of an interest rate factor is necessary.  That also made moot the parties' disagreement over whether the interest should have been compounded quarterly or annually.

**10. Tax Penalty Offset**

No Claimants will receive, under these Recommendations, a back pay award of greater than $50,000.00, the threshold for a "tax penalty offset" under Dr. LaJeunesse's calculations (Ms. Poe's total damages exceed that amount, but include out-of-pocket expenses which may not be taxable as income, as she did not claim the expense on her 2011 income tax return).  Nonetheless, a discussion of the subject is appropriate for the Court in the event that a back pay award may be modified to an amount over that threshold.

Dr. LaJeunesse, in his calculations, added a "tax penalty offset" when any Claimant's final damages exceeded $50,000.00.  His basis for this addition to damages was that, if the "but-for" pay at Prime had been paid on a periodic basis as a result of actual employment, that pay would normally have been taxed at a lower tax bracket than would a lump sum payment in excess of $50,000.00 received in one year.  He felt that the "anticipated bracket creep" in the federal tax code was a penalty for the Claimants that he could ameliorate with this "tax penalty offset".  His analysis ignored state income taxation and he recognized that the tax offset amount also triggers higher tax liability.

His $50,000.00 threshold represents the amount of income which, after typical tax exemptions and deductions, would produce an adjusted gross income of the $36,900.00 at which the marginal federal tax rate bumps from 15% to 25%.

Dr. LaJeunesse's specific tax offset calculation was fairly simple.  Taking Claimant Theodora Heath as an example, her final damages per his report were $55,511.39.   He simply multiplied her final damages by 10% (representing the bracket creep from the 15% tax bracket to the 25 % tax bracket), and produced a tax penalty offset for her of $5,551.14.  The bracket creep differed depending on the amount of final damages, but he consistently applied the bracket creep according to the federal tax

14

code brackets. Again, for example, his tax penalty offset for one Claimant with $255,000 in final damage was over $33,000.00.

Dr. Mullins, in his report dated June 15, 2015, found those additions to be reasonable and included them in his calculations. It should be noted, however, that Dr. Mullins' inclusion of the tax offset resulted in just about $11,000.00 in additions for two Claimants, while Dr. LaJeunesse's tax offset would have impacted final damages for about 20 Claimants to the tune of $200,000.00 in total, if his calculated back pay awards were adopted.

Defendant takes the position now that the tax offset is not an appropriate addition to damages, citing various cases, citing an 8th Circuit case stemming from the appeal of a Western District case, Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Local No. 101, 3 F. 3d 281 (8th Cir. 1993). Hukkanen had asserted that "the district court should have enhanced her monetary awards to compensate her for increased income tax liability resulting from receipt of the awards in one year, thus subjecting her to higher tax rates than she would otherwise pay on her wages and retirement benefits." The appellate court found no error in the district court's denial of Hukkanen's request "because she failed to present evidence of the enhancement's amount or a convenient way for the court to calculate the amount at the time the court announced its judgment." In this case, evidence of the enhancement's amount was presented, along with a convenient if imperfect way for calculation.

Any tax off-set application is subject to criticism because of the speculative nature of the beast. A back pay award of $60,000.00, for example, finally paid in tax year 2016, would subject a specific individual to a potential tax burden, the precise nature of which cannot now be determined. While all Claimants are subject to the same level of federal income taxation, income taxation at the state level is less consistent. Some states have no income tax at all. Even Dr. LaJeunesse omitted any consideration of a tax offset for state income taxes.

Depending on the level of other taxable income in the year of receipt, a $50,000.00 back pay award may not produce any taxable consequences above the 15% tax rate (if, for instance, the taxpayer has no other income, and sufficient reductions to keep her adjusted gross income below the $36,900.00 at which the tax burden increases from 15 to 25%).  For another claimant with personal or family income above $50,000.00, the entire $50,000.00 may be taxed at the higher marginal rate of 25%, or more.   Any Claimant with a smaller back pay award that $50,000.00 may also be exposed to additional taxes, depending on the level of other personal or family taxable income.

Even if a tax penalty offset is permissible, Dr. LaJeunesse's method has no basis for adoption by the Court, as it assumes that the entire back pay award would be taxed at the higher rate, presumably because the Claimant's other taxable income would already be at the top of the 15% tax bracket.

If presented with the issue, the Court may want to consider some method of dealing with the admittedly speculative but at least highly likely eventuality that the higher awards will generate some additional tax burden for the recipient.  The most appropriate method is to apply the bracket creep percentages only to that amount of the award that exceeds $50,000.00.  If a back pay award of $55,000.00 were determined for a single Claimant, the 10% would only be applied to $5,000.00, producing a tax penalty offset of $500.00, not the $5,500.00 that would result from Dr. LaJeunesse's application of his tax penalty offset.

If the $50,000.00 threshold had been exceeded in the individual Recommendations that follow, the evidence in this case would support a very modest tax offset in the amount of the marginal increase in rate from tax bracket to tax bracket, starting at the $50,000.00 level of back pay award.  For any lower amount, application of a tax offset is too speculative to be sound from a legal perspective.  To not apply the offset to amounts which are very likely to produce a negative consequence would be, though perhaps slightly speculative, more than fairly punitive.

16

### 11. CPI/present value

The Consumer Price Index and present value modifiers, used only by Dr. Mullins, were applied only to the extent that the Special Master adopted Dr. Mullins' numbers for "but-for" earnings at Prime. See Part II, sub. 1 above.

### 12. Excess periodic offsetting earnings

One of the issues presented in the case is whether excess, offsetting earnings on a periodic basis should be determined on an annual versus a quarterly basis. As a result of the determination herein that actual interim earnings (that is, earnings from other employment used to offset but-for earnings at Prime) are adjusted upward only by the actual cost and not by the higher "economic value" (see discussion in Part II, sub. 7, above), it has been determined that (except for Claimant Joan Zerbe, who was determined to have fully mitigated her damages) there were no excess mitigating earnings for any annual period, the period required to be considered by <u>Leftwich v. Harris-Stowe State College</u>, 702 F. 2d 686 (8th Cir. 1983).

### 13. Out-of-Pocket Expenses

A portion of the back pay damages claimed for some of the Claimants is for out-of-pocket expenses incurred after placement on the waiting list. Dr. LaJeunesse's chart (Exhibit 75) shows over $40,000.00 of out-of-pocket expenses incurred by some of the Claimants, mostly for truck driving school tuition.

The question of all of these expenses is to what extent they are attributable to the discriminatory hiring practice. If a Claimant was put on a waiting list by Prime, then attended a driver training program, is Prime responsible for those expenses? And does the answer change if the driver training program led to other trucking industry employment? However, the Defendant did not challenge those expenses, and their expert incorporated the expenses into his damages calculations. Of course, the record is replete with instances in which a Prime recruiter suggested to a wait-listed

applicant that they obtain their CDL training elsewhere to facilitate their same-sex Prime training. The Defendant has waived any argument that these expenses should not be awarded as damages.

The following Claimants had out-of-pocket expenses as reflected on the experts' charts:

| | |
|---|---|
| Audrey White | $3,500.00 |
| Aurelyn Labrew | $5,995.00 |
| Jacqueline King | $1,050.00 |
| Joan Zerbe | $3,000.00 |
| Karen Rogers | $3,895.00 |
| Lacolia Mungro | $1,008.00 |
| Penny Sheneman | $6,000.00 |
| Teresa Scott | $3,995.00 |
| Tracey Poe | $2,500.00 |
| Lisa Lambert | $3,400.00 |
| Michelle Little | $1,500.00 |
| Meredith McWhirter | $ 50.00 |
| Sue Sharabi | $4,200.00 |
| Thelisa Sulton | $ 120.00 |
| Lynnette Underwood | $ 50.00 |
| Voncile Heath | $ 200.00 |

Another Claimant, Rachel Parks Stafford, incurred a debt to Defendant for the cost of her training program with Defendant, only a portion of which was repaid after her employment and before her termination at Prime. Since her payments were made to Defendant after her wait list time had expired, no award of out-of-pocket expenses should be made for Rachel Parks Stafford. However, since she was terminated by Defendant, neither should any unpaid amount on that note be owed to or offset by Prime against her back-pay award.

The Court should know that there was evidence that some Claimants had their out-of-pocket expense for training reimbursed by a later employer. Those reimbursements have been considered under the collateral source rule.

**14. Imputed Income**

Some Claimants had lengthy periods of unemployment or what the Special Master deemed underemployment during the time of their qualifying period. The Defendant has taken the position that, generally, the failure to seek alternative employment shows a failure to mitigate damages which

18

should bar recovery of back pay. That position ignores the scenario involved in each one of the Claimant's cases: that they applied for a position at Prime and were told, in essence, "thank you for applying, you are on our waiting list while we find you a female trainer, and that may take several months." In that circumstance, it is difficult to conclude that a Claimant should be barred from back pay because they did not find another job when they were on a "wait list" for an employer like Prime. At the same time, compensating those Claimants fully for those lengthy periods may seem to be punitive for Prime. Imputing income is a reasonable middle ground, and appears to be specifically authorized in the enforcement provisions contained in Title VII, 42 U.S.C. Sec. 2000(e)(5)(g)(1), in which it provides in part, "Interim earnings **or amounts earnable with reasonable diligence** by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable" (emphasis added).

While neither party used any form of imputed income, the Special Master has, in appropriate cases, imputed income to Claimants with lengthy periods of unemployment or underemployment, the latter of which is determined to be a period in which the Claimant could have obtained more highly-compensating temporary employment that they actually obtained. In each case of imputed income, a "wait period" of six weeks was applied at the beginning during which no income was imputed (to allow for the waiting period status of each Claimant). The imputed income was calculated at the federal minimum wage of $7.25/hour for a 40-hour week, or $290.00 per week. In "underemployment" cases, the imputed income was applied in lieu of the other, lesser earnings reported by the Claimant and used by the experts.

### Part III: Miscellaneous

A. The Special Master, in making the Recommendations below, performed a Claimant-by-Claimant review for the purpose of making the individual back pay recommendations below. As suggested by the experts' testimony and the parties' pre-hearing briefs, the determination of a mitigation date (upon which date back pay eligibility would end) and whether certain evidence would

19

constitute a mitigating event) is the key element in these Recommendations. For each Claimant, a search was made in the evidence for a fact or facts which would support a specific cut-off date (See Part 1, Item 1 above). However, in three separate categories, detailed reviews of Claimants' records were performed: (1) when the length of the period of eligibility claimed by the EEOC for each Claimant with claimed quarters greater than 4; (2) when a lack of offsetting or mitigating earnings occurred throughout the qualified period; and (3) when there were periods within the qualified period of no- or low-income, indicating sporadic unemployment or underemployment. Details of those specific reviews are contained in Appendices A, B and C, respectively.

B. In addition to the original Plaintiff, Deanna Clouse, who settled her case with the Defendant, five Claimants have been dropped from the case by the Equal Employment Opportunity Commission (Claimants Whitehouse, Jackson, Bartels, Harriott and Parker). To the extent that it is within the Court's authority, the Recommendations below will contain a specific recommendation that the Court take such steps as are necessary to provide some level of assurance to these dropped Claimants that the adoption of these Recommendations by the Court will have no res judicata or collateral estoppel effect on any potential future claims by those five Claimants.

C. Only one Claimant would receive no back pay awards under these Recommendations; Claimant Joan Zerbe because she fully mitigated her loss through other trucking industry employment during the period of her determined eligibility. However, Ms. Zerbe had out-of-pocket expenses which provided for her damages.

D. Two other Claimant's records suggest a special mention:

(1) Danessa Rauster: My review of "outliers" brought up an issue with respect to the records of Ms. Rauster. Although neither expert dealt with a second application, the record clearly shows a second application filed December 29, 2011. Exhibit PRI002576. The Recommendations include, therefore, two separate periods of eligibility for Ms. Rauster. For the first period, wages were imputed at minimum

wage level for 6 of the 12 weeks of that qualifying period (See Part II, sub-part 14 above). For the

second period, she indicated (Answer to Interrogatory 22 in Second Interrogatories) that she made, at

different times with FFE during that period, $455.00 per week as a trainee, 29 cents a mile, and

$130.00/day for FFE. For ease of computation, that is averaged-out to $500.00 per week from March 7,

2012, through the cut-off date of June 15, 2012 (14 weeks) or $7,000.00. The Special Master assumed a

benefit factor of 10% for this reconstruction of the second period.

(2) Lynnette Underwood: In addition to the imputed wage shown in Appendix B, some

discussion is appropriate in the case of Ms. Underwood. Shortly after her application, in October 2012,

she sustained a work-related injury at her then-employer, and was on workers' compensation for a

period of time. She had been authorized to return to work (if she had not been, a more difficult cut-off

decision may have been required), however, and is included above for that reason. In the absence of

more information (a deposition of Ms. Underwood is not included in the evidence) a mitigation date

other than the one chosen is not supported by the evidence.

E. The parties provided the Special Master with case law relevant to this task. While a selective

review of the cases was done, those cases are generally not cited herein.

F. There was some discussion as to the end date for any eligibility for back pay being the

ultimate judgment date in the case. That discussion is moot as a result of the Recommendation below

which shows that no Claimant has eligibility for back pay beyond 2013.

G. A series of Excel spreadsheets were prepared in the course of the Special Master's work for

the necessary process of populating certain fields for ease of calculation, cross-checking data, and

determining the back pay recommendations. A final, truncated version is attached hereto as Appendix

D.

H. Three Claimants (Ms. Rauster, Ms. Bracy and Ms. Sulton) were determined to have multiple

applications and, accordingly, multiple periods for back pay consideration. Ms. Sulton specifically

waived her claim for back pay for the first application period, but Claimants Rauster and Bracy were considered eligible for back pay for two separate periods, as shown on Appendix D.

I. The Special Master maintained a record of the time spent on this case, and has provided the parties with an interim invoice for a portion of that time. An additional invoice will be provided to the parties upon delivery of this Report and Recommendation to the Court. That record indicates that 153.7 hours have been dedicated to this case through the date of this Report and Recommendation.

## Part IV:  Final Methodology Selected by Special Master

For each Claimant, the following specifics are provided to describe the methodology applied by the Special Master in making the Recommendations for back pay for each Claimant:

1. The Application date and start date contained in Dr. Mullins' "Estimation of Earnings Differential" dated June 22, 2015 (Exhibit G), were used to determine the beginning day for any period of back pay eligibility (some Claimants had two different periods).

2. The end day for any period of back pay eligibility (also sometimes referred to herein as "the mitigation date" or "the cut-off date") was determined after a complete review of the evidentiary documents for each Claimant, and after consideration of a broad range of factors relevant to the issue of mitigation.

3. Steps 1 and 2 above determined the period of eligibility or qualifying period, always expressed in a specified end date and by the number of quarters (most often to the one-hundredth decimal place).

4. Each Claimant's "but-for earnings" if employed at Prime was determined based upon Dr. Mullins' "Present Value of 'But For' Earnings plus benefits", as shown in the so-named column for each Claimant in the Appendix to Exhibit G, pages 15-54, for the specific period of eligibility.

5. For the specific period of eligibility, each Claimant's offsetting earnings from other employment (also occasionally referred to as "interim earnings", "actual earnings" or "mitigating

earnings), including imputed earnings when appropriate, were then subtracted from the Claimant's "but-for earnings". These offsetting earnings, other than imputed earnings which were determined by the Special Master, were gleaned from Dr. LaJeunesse's Tables to Exhibit 75, and a fringe benefit factor, also based on Dr. LaJeunesse's numbers, was applied to those offsetting earnings but not to the imputed earnings.

6. For each Claimant, the mathematical result (of subtracting 5 above from 4 above) is the Claimant's back pay award per these Recommendations, and adjusted for some Claimants by claimed out-of-pocket expenses.

## Special Master's Recommendations

The Special Master submits the following recommendations of proposed findings to the Court for approval:

1. That the Final Methodology set forth in Part IV above is a reasonable approach and should be approved by the Court.

2. That the back pay calculations of the Special Master, contained in Recommendation 15 below, use the preferred start date approach of Dr. Mullins, which recognized a different post-application start date for those with and without Commercial Drivers' Licenses, over that of Dr. LaJeunesse, which did not so differentiate.

3. That the mitigation or end dates applied to each Claimant by the Special Master are reasonable, and provide an attrition element to each Claimant that are based on the facts of each claimant, and, further, that applying separate industry- or firm-specific attrition rates would be duplicative and punitive to the Claimants.

4. That the attrition rates applied by Dr. Mullins regarding failure to attend and failure to complete training are speculative and unreliable as applied by Dr. Mullins.

5.  That the Defendant has the burden of proof on mitigation, and it did not meet that burden to establish any other date or dates than those established and set forth by the Special Master in the recommendations.

6.  That, given the wait-list scenario in which the Claimants were placed by Defendant, which was found by the court to be discriminatory, each of the Claimants, until the date specified as their back-pay eligibility cut-off date, made a good faith effort to minimize damages.

7.  That, as to the valuation of fringe benefits, the "actual cost of benefits", as applied by Dr. Mullins, is more specific and reliable than the "economic value of benefits", as applied by Dr. LaJeunesse.

8.  That the adoption by Dr. Mullins of Dr. LaJeunesse's "economic value" benefit modifier for offsetting earnings is inconsistent with his "actual cost" modifier for fringes in "but for" earnings calculations, and that the Special Master's final back pay determinations properly and in a more consistent fashion use the lower actual cost fringe benefit modifier to produce an acceptable estimation of each Claimant's actual offsetting earnings plus fringe benefits.

9.  That application of a present value factor to "but for earnings", as done by Dr. Mullins, is proper, but, application of a present value factor to Claimants' mitigating earnings is inappropriate because it adjusts to a higher number their mitigated earnings, which were received at the time of their employment and consumed.

10.  That the Consumer Price Index and interest rates used by Dr. Mullins in his present value adjustment to "but-for" earnings is proper.

11.  That the amount of the recommended back pay awards avoids the importance of addressing the tax offset issue, but that the Court consider the tax offset approach contained herein in the event individual back pay awards may be modified to an amount larger than $50,000.00.

12.  That the imputation of earned income at the federal minimum wage level is an appropriate method of assigning income potential to periods for which individual Claimants may not have, perhaps for reasons related to the "waiting-list" scenario at Defendant, been able to obtain other employment, and is also appropriate in "underemployment" situations, as an alternative to disqualification for failure to mitigate in the waiting list environment.

13.  That there be included in the back pay damages of certain Claimants their out-of-pocket expenses incurred for training as set forth in Part II, sub-part 13, and that, in the exercise of the Court's authority per the statute to fashion an equitable remedy, Defendant be deemed to have waived any right to an offset for amounts that may be claimed to be owed by Rachel Parks Stafford to Defendant for unreimbursed training expenses.

14.  That, for those five Claimants dropped from the case by the Equal Employment Opportunity Commission (Claimants Whitehouse, Jackson, Bartels, Harriott and Parker), the Court make a specific finding, if possible, that this Report and Recommendation, if adopted by the Court in whole or in part, will have no res judicata or collateral estoppel effect on those Claimants.

15.  That the following back pay and total damage awards be made to the Claimants:

| No. | Claimant | Final Back Pay | Out-of-Pocket Expenses | Total Damages |
|---|---|---|---|---|
| 1 | Arledge, Alexandra | $4,533.00 | | $4,533.00 |
| 2 | Bean, Lorna | $5,287.00 | | $5,287.00 |
| 3 | Brown, Leanne | $32,158.90 | | $32,158.90 |
| 4 | Calahan, Betty | $27,190.00 | | $27,190.00 |
| 5 | Clark, Sandra Davis | $48,963.94 | | $48,963.94 |
| 6 | Crawford, Marsha | $11,169.00 | | $11,169.00 |
| 7 | Davis, Lisa | $27,897.00 | | $27,897.00 |
| 8 | Elston, Amy | $8,574.58 | | $8,574.58 |
| 9 | Harris, Keyona | $24,323.00 | | $24,323.00 |
| 10 | Heath, Theodora | $25,646.00 | | $25,646.00 |
| 11 | Hooper, Kalisha | $17,851.80 | | $17,851.80 |
| 12 | King, Jacqueline | $21,103.85 | $1,050.00 | $22,153.85 |
| 13 | Knapp, Donna | $26,640.10 | | $26,640.10 |

25

| | | | | |
|---|---|---|---|---|
| 14 | Labrew, Aurelyn | $5,315.16 | $5,995.00 | $11,310.16 |
| 15 | Martin, Mary | $19,158.88 | | $19,158.88 |
| 16 | Mayder, Christie | $29,501.88 | | $29,501.88 |
| 17 | Mungro, Lacolia | $38,928.13 | $1,008.00 | $39,936.13 |
| 18 | Myles, Angela | $23,963.04 | | $23,963.04 |
| 19 | Nash, Alice | $7,639.00 | | $7,639.00 |
| 20 | Owens, Darla | $3,371.50 | | $3,371.50 |
| 21 | Stafford, Rachel Parks | $15,392.98 | | $15,392.98 |
| 22 | Pasteur, Deidre | $49,332.26 | | $49,332.26 |
| 23 | Perez, Elizabeth | $2,136.00 | | $2,136.00 |
| 24 | Pfundheller, Elsa | $6,771.44 | | $6,771.44 |
| 25 | Poe, Tracey | $48,497.38 | $2,500.00 | $50,997.38 |
| 26 | Portis, Stacey | $1,117.32 | | $1,117.32 |
| 27 | Price, Naquita | $6,757.91 | | $6,757.91 |
| 28 | Quintal, Kristina | $36,214.16 | | $36,214.16 |
| 29 | Rauster, Danessa | $25,890.00 | | $25,890.00 |
| 30 | Rogers, Karen | $15,127.00 | $3,895.00 | $19,022.00 |
| 31 | Sampson, Laura | $8,995.16 | | $8,995.16 |
| 32 | Sanders, Karen | $6,208.26 | | $6,208.26 |
| 33 | Scott, Teresa | $26,594.27 | $3,995.00 | $30,589.27 |
| 34 | Sharpe, Deborah | $2,251.92 | | $2,251.92 |
| 35 | Sheneman, Penny | $1,435.35 | $6,000.00 | $7,435.35 |
| 36 | Shephard, Sophia | $23,249.44 | | $23,249.44 |
| 37 | Siegel, Aubrie | $26,397.08 | | $26,397.08 |
| 38 | Smith, Geraldine | $9,857.44 | | $9,857.44 |
| 39 | Thompson, Debra | $462.60 | | $462.60 |
| 40 | White, Audrey | $36,682.72 | $3,500.00 | $40,182.72 |
| 42 | Wikle, Stephanie | $14,373.22 | | $14,373.22 |
| 43 | Wooley, Monica | $21,274.06 | | $21,274.06 |
| 44 | Zerbe, Joan | None | $3,000.00 | $3,000.00 |
| 46 | Bracy, Fay | $26,476.00 | | $26,476.00 |
| 47 | Brown, Stephanie | $14,479.08 | | $14,479.08 |
| 48 | Carlisle, Sharla | $2,340.22 | | $2,340.22 |
| 49 | Hall, Virgie | $11,096.26 | | $11,096.26 |
| 52 | Lawson, Doretta | $24,696.28 | | $24,696.28 |
| 53 | Lambert, Lisa | $19,854.00 | $3,400.00 | $23,254.00 |
| 54 | Little, Michelle | $15,610.40 | $1,500.00 | $17,110.40 |
| 55 | McWhirter, Meredith | $6,907.00 | $50.00 | $6,957.00 |
| 56 | Young, Cheryl Morgan | $16,342.00 | | $16,342.00 |
| 57 | Moss, Angela | $4,648.10 | | $4,648.10 |
| 59 | Pfaffly, Debra | $818.04 | | $818.04 |
| 60 | Robinson, Shockia | $9,703.93 | | $9,703.93 |
| 61 | Sharabi, Sue | $8,782.60 | $4,200.00 | $12,982.60 |

26

| | | | | |
|---|---|---|---|---|
| 62 | Snipe, Carol | $12,029.87 | | $12,029.87 |
| 63 | Stockwell, Kelly | $27,415.00 | | $27,415.00 |
| 64 | Sudderth, Debra | $12,551.34 | | $12,551.34 |
| 65 | Sulton, Thelisa | $26,880.94 | $120.00 | $27,000.94 |
| 66 | Troy, Jennifer | $24,051.26 | | $24,051.26 |
| 67 | Underwood, Lynnette | $13,554.00 | $50.00 | $13,604.00 |
| 68 | Heath, Voncile | $12,455.70 | $200.00 | $12,655.70 |
| | | $1,084,925.75 | $40,463.00 | $1,125,388.75 |

Respectfully Submitted,


s/ Jeff W. Schaeperkoetter
Jeff W. Schaeperkoetter
Special Master

August 27, 2015

27

**APPENDIX A**

**Review of Specific Cases for
Mitigation Date for Long-Term "But-for" Eligibility Periods**

The Defendant produced evidence regarding the ultimate change of the discriminatory policy in April 2013, and the communication by Prime to EEOC, dated June 12, 2014, (Exhibit W), asking the EEOC to invite their clients to re-apply, the policy having been changed to end the "same-sex" training requirement. The upshot of that evidence was an attack on those long-term "but-for" eligibility periods. The undersigned conducted a review of those Claimants with long-term eligibility by number of quarters (other Claimants were reviewed in this category, and some of them are not included in the listing below because no significant change was made and there is no evidence to support a cut-off date earlier that applied in these recommendations).

1. **Fay Bracy: (see discussion in Appendix C)**

2. **Leanne Brown:** Leanne Brown also failed to seek comparable employment within the trucking or similar industry, and her failure to adequately mitigate her damages results in a recommendation that her cut-off date be established at November 27, 2009, for 3 quarters of eligibility. (Also, see imputed earnings discussion as to Ms. Leanne Brown in Appendix C).

3. **Stephanie Brown:** Stephanie Brown applied to Prime on August 11, 2011. She was employed at the time and maintained that employment long-term. There is no evidence in the records that she either sought or obtained employment in the trucking or a comparable industry, and it is clear from the record that she had failed to adequately mitigate her damages by June 30, 2012, for 3.10 quarters.

4. **Lisa Davis: (see discussion in Appendix C)**

5. **Keyona Harris:** Ms. Harris applied to Prime in February 2010. She was ultimately taken into Prime's training program in April 2011, and left shortly thereafter for personal reasons. Her 6 quarters of claimed eligibility caused this review. There was an invitation from Central Trucking (date unknown

28

as her deposition has no specifics) to join their training program, but she turned them down.  In the absence of any other indication that she sought comparable employment, a cut-off date of December 31, 2010, is recommended, for 3.15 quarters.  Because of her very low earnings, imputed wages are recommended for 35 of the 41 weeks, at $10,150.00, in lieu of actual earnings.

**6.  Theodora Heath:**  Ms. Heath applied May 16, 2011.  Prime attempted to contact her March 16, 2012, with a trainer ready, but her phone numbers were either out-of-service or unanswered.  By her failure to provide Prime with the ability to contact her, she prompted a cut-off date at that time, March 16, 2012, for 2.88 quarters of eligibility.

**7.  Kalisha Hooper:**  Ms. Hooper applied September 20, 2010, at Prime.  She held a Bachelor's degree in computer science and did not seek other comparable employment in the trucking industry.  Her failure to obtain other employment in the trucking industry by August 15, 2011, makes it clear from the record that she had failed to adequately mitigate her damages by seeking other comparable employment by that date, and her cut-off date is established at August 15, 2011, for 3.17 quarters.

**8.  Jacqueline King:**  Ms. King started and quit another truck-driving program after her Prime application.  Ms. King's interest in a trucking career seems largely relationship-driven.  She was riding with a friend and hoping to get on at Prime with him.  His payment for her short-stint in a driving school caused their relationship to sour (Exhibit 12, Deposition of Claimant, page 105), and she quit the training program and she and her friend broke up in 2009.  By January 2010 or 2011, she was no longer interested in a trucking career and started to school at Washburn University (Prime Appendix, Exhibit R, says January 2010, but a closer review of her deposition, at pp. 112-113, shows that she corrected that to the following year after realizing she had gotten her GED in November 2010).  However, long before that, she had failed to adequately mitigate her damages by seeking comparable employment (Deposition, pages 110-111).  The appropriate date for the cut-off of eligibility for Ms. King is September 30, 2009, for 3.04 quarters.

**9. Donna Knapp:** One of those reviewed for this purpose was Claimant Donna Knapp. After applying at Prime on July 17, 2010, Ms. Knapp was employed with Warner Enterprises, another large trucking company, on October 8, 2010, and, according to the information available, remained employed at Warner through much if not all of this litigation. At any time during her employment at Warner, with her Commercial Driver's License in hand, Ms. Knapp could have reapplied to Prime and likely would have been welcomed as an employee. So the undersigned must consider whether the lengthy eligibility for back pay (in the amount of 22 quarters from application through the end of 2015) is appropriate. Even though that lengthy eligibility produces, under EEOC's calculations, just over $50,000 in back pay, the undersigned determines that a cut-off date should be applied to Ms. Knapp as a result of her choice to remain at Warner. She took on a trainer assignment in 2013 (a "couple of months ago", at her September 23, 2013 deposition). That would suggest that a July 30, 2013, cut-off date might be appropriate. Another potential cut-off date might be the end of Q4 of 2011. Her 2012 actual earnings approached what she might have earned at Prime (roughly 85%), and by that time she had over a year at Warner. Or the undersigned might consider October 8, 2010, her Warner start date. I lay all of this out to indicate the difficulty of the decision. That notwithstanding, the undersigned determines that, as of December 31, 2011, when Ms. Knapp had apparently settled in for the long term and, even in the turbulent labor market that swirled within the trucking industry, sought no other trucking company other than Warner for a suitable home, she had adequately mitigated her damages and was no longer eligible for back pay. The undersigned notes with some degree of admiration not only her loyalty to her employer, but also the manner in which she handled the questioning at the deposition.

**10. Doretta Lawson:** In April or May of 2013, Ms. Lawson became aware of the policy change on same-sex trainers from her friends, the Conways. She was working for Mijenn, a trucking company, at the time. In June 2013, aware of the policy, she quit Mijenn and went to work at Central Trucking without re-applying to Prime. In March and April 2013, she had conversations with the EEOC about this

claim and, presumably, the potential of back pay. Under those circumstances, the Special Master has concluded that Ms. Lawson had fully mitigated her eligibility for back pay on June 15, 2013, for 2.95 quarters of back pay eligibility.

**11.  Mary Martin:**  Ms. Martin applied at Prime on January 26, 2012.  She also applied to two other companies contemporaneously, was accepted into another program, but did not enter the program.  She had no other trucking industry efforts and entered into employment at Home Depot in May 2012.  Her failure to obtain other employment in the trucking industry by December 31, 2012, makes it clear from the record that she had failed to adequately mitigate her damages by seeking other comparable employment by that date, and her cut-off date is established at December 31, 2012, for 3.26 quarters.

**12.  Christine Mayder:**  Ms. Mayder applied to Prime in March of 2008, and Schneider at about then same time.  She never heard from Schneider.  In January 2009, after considering another truck driving program, she decided to enter into schooling for a medical technologist degree.  The Lincoln Tech program "had more to offer" than a trucking position.  Exhibit 16, Deposition of Ms. Mayder, page 49.  At that time, her interest in driving apparently waned, as she never sought other truck driving employment.  She thereafter took employment in the medical field.  Her cut-off date is recommended to be December 31, 2008, the end of the quarter prior to entry into the medical training program, for 2.78 quarters.

**13.  Angela Moss:**  Ms. Moss shows eligibility for 13 quarters on Dr. LaJeunesse's chart.  That prompted this review.  In its Appendix, Exhibit R at page 89, Defendant claims that she had fully mitigated when she took employment with the Union Pacific Railroad in March 2013 (Appendix improperly has date as "February/March 2012"), to justify only just five quarters.  While March 11, 2013, is the appropriate cut-off date, her application date of October 1, 2012, and her resulting start date of November 12, 2012, produces only 1.30 quarters of back pay eligibility.

14. **Angela Myles**: Another long-term qualifier review was done for Ms. Myles. Her suggested 8 qualifying quarters commence with her projected start date of August 11, 2010, and extend through the middle of 2012. The evidence has no indication that she sought comparable employment after her application (she did not remember applying elsewhere besides Prime). While a period of such inactivity may be explained by the waiting list scenario, two years is not. Her cut-off date is recommended to be June 30, 2011. The quarter ending that date showed employment, and the quarters following showed very little actual earnings, without any indicated effort to find trucking industry or comparable employment. Thus, she has 3.56 eligible quarters. Earnings are imputed for 14 of the 20 no-earnings weeks reflected in the records in the amount of $4,060.00 in addition to her other earnings.

15. **Deidre Pasteur:** According to the EEOC expert's calculations, Ms. Pasteur is qualified for 20 quarters of back pay. That generated this review. Dr. Mullins' calculations show "excess" earnings starting in Q1 of 2014. Her deposition and interrogatories were completed in 2013, but the file contains an earnings statement from Nissi Group showing earnings through December 20, 2014, of $52,351.34. She had started there in June 2013, and, at the very least, that would have cut off the back pay. An earlier cut-off date is more appropriate.

After her application to Prime, Ms. Pasteur drove for Willie Shaw Express for three months, Schneider National Trucking for three months, Metropolitan Trucking for two months, Mail Contractors for eleven months, J & R Schugel for four months, and Veolia for two months. Each of those employments were terminated by Claimant (bad or unsafe equipment at the first two, not enough money or good enough hours or enough at the next three). Ms. Pasteur was an owner-operator at TLS Trucking in January 2013 in the middle of her time at Schugel. (Deposition 78). After Schugel, in about February 2013, she decided that she did not want to do over-the-road trucking (Deposition 82). The

undersigned finds that, by becoming self-employed as an owner-operator in the trucking business in January 2013, Ms. Pasteur had mitigated her damages and her back pay is cut off as of December 31, 2012. Her quarters of eligibility for back pay are reduced to 7.89 quarters.

16. **Tracey Poe:** In May 2013, Ms. Poe was offered long-haul driving at Swift but turned it down as she wanted local or regional work. Depo 58-59. Ms. Poe did team-driving with her husband at James Owen Trucking, but they divorced and she did no over-the-road trucking after leaving Owen Trucking in August 2011. There is scant evidence of other efforts to get into a trucking career outside of her application to Swift. Those efforts do not justify a finding that Ms. Poe was adequately seeking to mitigate her back pay over the course of the years that followed her application. A cut-off date earlier than the 15 quarters claimed is appropriate. She quit a truck-driving job with an excavating company in February 2012. By May 15, 2012, Ms. Poe could have obtained comparable employment in the trucking industry if she had been committed to long-haul trucking of the sort Prime required. She did not, and her eligibility for back pay is cut off on May 15, 2012, after 6.13 quarters.

17. **Stacey Portis:** Stacey Portis applied to Prime February 7, 2008, and Dr. Mullins would put her start date at March 20, 2008, allowing for training time. She also applied at Schneider and Con-Way, both major players in the trucking industry. She went to work for Con-Way in March 2008. Her actual earnings for Con-Way were very similar to those she would have earned at Prime**,** and the it is determined that she had mitigated her back pay by seeking and obtaining comparable employment, and her cut-off date is determined to be March 31, 2008. Her eligibility for back pay is reduced to 0.13 quarters.

18. **Sophia Shephard:** Ms. Shephard was reviewed for long-term eligibility because EEOC has taken the position that she is eligible for 9 quarters of back pay. The Defendant suggested that her mother's illness and subsequent death in June 2012 may have resulted in an earlier cut-off date. Timely objections were made as to the speculative nature of the question about whether she would have had

to leave Prime to take care of her mother, and those objections are sustained.  It would be pure speculation to assume that she would have requested a change in her work status, and what Prime's response would have been if she had.  However, her application was May 14, 2011.  In addition to her application at Prime, she also applied at CR England and FedEx.  Medical procedures caused her to turn down the England training program.  She was unspecific as to her application for the Paducah Truck Driving program, and drove a bus for the Paducah Schools.  Her failure to obtain other employment in the trucking industry by March 31, 2012, makes it clear from the record that she had failed to adequately mitigate her damages by seeking other comparable employment by that date, and her cut-off date is established at March 31, 2012, for 3.07 quarters.

      **19.  Geraldine Smith:**  EEOC Exhibit 75 by Dr. LaJeunesse shows Ms. Smith still eligible for back pay at 24 quarters.  However, Ms. Smith started a roofing business in Colorado in August 2010, and has consistently had an earnings level from that business higher than or equal to her "but-for" earnings.  Her back pay eligibility is cut off August 15, 2010, when she started her own business, at 2.16 quarters.

      **20.  Debra Thompson:**  Ms. Thompson shows on the EEOC charts at 10 quarters of eligibility.  However, she was accepted to Swift's training program in June 2011, and dropped out very quickly because she was unable to reach the trainer truck's clutch.  She did not see whether other trucks were available which she might be handle physically, and quit for personal reasons associated with her training experience.  A mid-month cut-off date of July 16, 2011, is appropriate.  Given that her start date at Prime would have been in July 12, 2012, and that her training issue at Swift may have been repeated at Prime, Ms. Thompson has only 5 days or 0.05 quarters of eligibility.

      **21.  Audrey White: (see discussion in Appendix C)**

      **22.  Stephanie Wikle:**  Ms. Wikle was invited to Alliance Trucking's training program "about a year" after her Prime application, but did not attend because it would have impacted her employment as a Certified Nurse's Assistant (CNA).  She withdrew from the East/West driving program, and sought

34

employment early in the process with Swift as well.  However, she never did obtain employment in the trucking industry, and her failure to do so by June 30, 2011, makes it clear from the record that she had failed to adequately mitigate her damages by that date, and her cut-off date is established at June 30, 2011, for 3.17 quarters.

**23.  Monica Wooley:**  Ms. Wooley applied to Prime on January 4, 2011.  She had pre- and post-application employment with the United States Postal Service, and never sought other trucking industry employment beyond the initial application stage.  Her failure to seek or obtain other employment in the trucking industry by November 30, 2011, makes it clear from the record that she had failed to adequately mitigate her damages by seeking other comparable employment by that date, and her cut-off date is established at November 30, 2011, for 3.07 quarters.


**APPENDIX B**

**Review of Specific Cases for**
**Imputed earnings in cases of extended unemployment**

In the cases of 12 Claimants (Claimants Arledge, Calahan, Theodora Heath, Nash, Perez, Rauster, Rogers, McWhirter, Cheryl Morgan Young, Stockwell, Underwood and Voncile Heath), both experts' calculations included no offsetting interim wages after the application date.  In another, Lisa Lambert (discussed in Appendix C), very small interim wages were included in the experts' calculations.  While some of those Claimants received unemployment benefits, the undersigned did not consider unemployment benefits received, or, for that matter, workers' compensation benefits received, under the collateral source rule.  The Defendant did not use those benefits in its calculations, nor seek their inclusion in this Report and Recommendation.

The undersigned does, however, think that, while those periods of unemployment should not disqualify the Claimants for back pay, imputed earnings equal to the federal minimum wage ($7.25 per hour for the entire period) should be applied as offsetting interim earnings for periods in excess of a

35

determined amount.  Several of those Claimants' periods of unemployment after application date extended beyond what the undersigned considers to be a reasonable time.  For the purposes of this case, the undersigned considered any period of 6 weeks or less (only Ms. Perez at one week, and Ms. Arledge at 6 weeks) to be periods that were reasonable under the circumstances of the "waiting-list" scenario into which the Defendant had placed the Claimants.  In all of the other cases, except for Voncile Heath, discussed next, the Special Master has imputed and applied as offsetting interim wages $290.00 per week ($7.25 times 40 hours) for all weeks of a Claimant's back pay period beyond 6 weeks (the Special Master intentionally added no value for benefits, for obvious reasons).

In reaching the foregoing conclusion, the undersigned was unable to find from the evidence presented that the lengthy period of unemployment in some fashion resulted in a failure to mitigate damages.  The burden of proof in this regard is on Defendant, and the burden was not met.

The following chart shows the imputed earnings for the respective Claimants:

| Name | Total Weeks | Imputed/Weeks | Amount |
| --- | --- | --- | --- |
| Alexandra Arledge | 6 | 0 | -0- |
| Betty Calahan | 38 | 32 | $9,280 |
| Theodora Heath | 38 | 32 | $9,280 |
| Alice Nash | 14 | 8 | $2,320 |
| Elizabeth Perez | 1 | 0 | -0- |
| Danessa Rauster | 12 | 6 | $1,740 |
| Karen Rogers | 24 | 18 | $5,220 |
| Meredith McWhirter | 48 | 42 | $12,180 |
| Cheryl Morgan Young | 26 | 20 | $5,800 |
| Kelly Stockwell | 41 | 35 | $10,150 |
| Lynnette Underwood | 23 | 17 | $4,930 |

For all Claimants for whom earnings were imputed here and in Appendix C, the records regarding the Claimants were reviewed additionally, and in each case there was no indication noted in those records that any of the Claimants received unemployment benefits for any period for which earnings were imputed.

The parties apparently concluded that Voncile Heath's employment at PAM Transport commenced in October 2013. However, a review of the Exhibits prompted by this imputed wage exercise revealed that she actually started there in October 2012 (Exhibit 68, Interrogatory 42). Thus, the experts' calculations as to Ms. Heath did not include her employment for Quarter 4 of 2012 at PAM Transport, in the amount of $4,629.00 (Exhibit 68). That W-2 amount, reported on her 2012 tax return, does not include any benefits. Because Ms. Heath was required to pay for a portion of her benefits, the Special Master has added a 10 per cent factor, for a total offsetting interim wage amount of $5,092.00 for Quarter 4 of 2012.

Neither do their calculations include an offset for Ms. Heath's 2013 earnings at PAM in the amount of $21,954.81. Those earnings at PAM occurred through October of 2013, and her cut-off date has been determined herein to be April 15, 2013, so the undersigned has applied a multiplier of 0.35 to those annual earnings (representing 3.5 out of the 10 months she worked at PAM that year), for the inclusion of $7,684 in offsetting interim wages in 2013 (all of which the Master has assigned to Quarter 1 of 2013 for simplicity), with a benefit factor of 10% added for a total of $8,452.00.

### APPENDIX C

### Review of Specific cases for
### Imputed wages in cases of extended unemployment/underemployment

The undersigned also considered extended periods of unemployment or potential underemployment in the qualified period. Those Claimants whose records were reviewed for this purpose are Fay Bracy, Leanne Brown, Lisa Davis, Lisa Lambert, Michelle Little, Angela Myles, Debra Sudderth, Thelisa Sulton, and Audrey White (note that some Claimants are reviewed in multiple categories).

**1. Fay Bracy:** Ms. Bracy's first application date was August 24, 2011. For that qualifying period, her cut-off date was moved up to March 31, 2012, as a result of her full-time student status from April

37

2012 through July 2013 at Cincinnati State Community and Technical College.  Exhibit 46, Interrogatory 41.  She later attempted to find a trucking job, but her prior alcohol-related conviction served as a barrier.  As with most of the later-added Claimants, no deposition of Ms. Bracy was provided.  While the EEOC suggested a cut-off date of June 2013 in its Supplemental Responses to Interrogatories (Exhibit 46, Tab C, page 3), that was clearly prior to the second application, and most likely represents its suggested cut-off date for the first application.  In the absence of evidence of a cut-off date for the second application, or evidence that Ms. Bracy sought other comparable employment, the Special Master recommends a finding that Ms. Bracy had either fully mitigated or failed to adequately attempt to mitigate her back pay as of November 27, 2013, three months (and one quarter) after the August 27, 2013, presumed start date for her July 15, 2013 application.  It is noted that her second application was filed three months after Defendant claims to have changed its same-sex training policy (Exhibit W), but there is no reference located in the exhibits that shows Ms. Bracy was even contacted by Prime after that application.  Thus, Ms. Bracy has 1.89 quarters for her first application, cut off by her schooling endeavor, and one quarter for the second.   For each of her qualifying periods, however, it is appropriate to impute earnings due to her persistent unemployment or underemployment.  For the first period of 1.89 quarters, earnings will be imputed for 18 of those 24 weeks, at $290.00 per week, for $5,220.00.  For the second period of one quarter, earnings will be imputed for 7 of 13 weeks in the amount of $2,030.00.

    **2. Leanne Brown:**  As to Leanne Brown, two of her 2009 quarters reflect no income (Exhibit G, page 28), but all of her 2009 income was assigned to the Q3 and Q4 of that year, and she received unemployment compensation that likely was attributable to the first two quarters.  Thus, no imputation of income will be made for those periods.

    **3. Lisa Davis:**  Ms. Davis presents another interesting Claimant with long-term qualifying period (no cut-off per EEOC, so 28 quarters through EOY 2015).  The undersigned had previously tentatively

determined that her employment at Circles should terminate her eligibility at just over 16 quarters (the Claimant had previously been self-employed in the travel agent business from before the time of her application). However, this unemployment/underemployment inquiry and her very low annual earnings require a closer review of her records (Exhibit 40), and prompt a re-visit of that determination. Ms. Davis, then married to her husband who had simultaneously applied to Prime, had an unreasonable expectation of her potential earnings at Prime. She expected that each of them could make $100,000 per year at Prime. That amount was her threshold, the minimum amount she would consider for applying to a company. She applied to no other trucking companies than Prime. Exhibit 7, Deposition of Claimant, page 101-102. Her husband went into training at Prime, was employed, but terminated his employment in July 2009 because the Claimant had not been hired there. Given the Claimant's unreasonable expectations of earnings and her desire only to work/drive with her husband and her/their failure to apply elsewhere in an industry in which the companies are hungrily looking for drivers, the undersigned finds that the Claimant Lisa Davis did not make an adequate effort to mitigate her damages after November 24, 2009, and determines that day as the appropriate cut-off date for Ms. Davis. Accordingly, the calculations are amended to show her eligibility for 3.0 quarters. For those 39 weeks, wages should be imputed for 33 weeks at $290/week, for $9,570.00, in lieu of the actual earnings shown for 2009.

**4. Lisa Lambert:** Ms. Lambert's case was reviewed more closely because of her claimed 4 quarters of eligibility and very low interim or offsetting wages (less than $5,000.00 for the year). The review revealed that Ms. Lambert actually filed applications with Prime on three occasions, September 2011, December 2012 and April 2013. In 2012, she worked at Swift as an employee and as an independent contractor (through most of 2012), JR Scheel, a trucking company (from November 2012 to January 2013), when she was hired by Prime in February 2013, but quickly became an owner-operator because of truck availability, for a position that would last less than a month, at which point she

resigned from Prime. Exhibit EEOC009365-9366. Her recorded interim earnings of less than $5,000.00 for a full year of driving jobs is likely indicative of the concern expressed by Prime that they had not received updated income information from many of the Claimants. Interestingly, those four quarters of eligibility do not span the entire time between the first application (9/28/2012) until her employment at Prime February 2013). There is a concern that the reported income is so low because the Claimant was operating for a portion of the year as an owner-operator at Swift (from June 2012). That owner-operator status justifies a cut-off date of June 15, 2012 (2.45 quarters), and the Claimant is imputed earnings at minimum wage level for all but 6 weeks of her eligibility from start date to cut-off date (26 times 290/week), for $7,540.00 in imputed earnings in lieu of the actual earnings reported.

5. **Michelle Little:** The calculations for Ms. Little, another undeposed, later-added Claimant, shows earnings of only $1,841.00 over the nearly five year period shown. A closer review of her records shows that she answered Interrogatory No. 41 by indicating that she went to work at Swift in January 2013. Her cut-off date is set at December 31, 2012. For the 25 weeks of qualified back pay eligibility, 19 of those will be imputed earnings at $290/week, or $5,510.00, in lieu of the actual earnings reflected on the calculations.

6. **Debra Sudderth:** The calculations reflect only $442.00 in offsetting earnings for Q3 and Q4 in 2012 for Ms. Sudderth, also undeposed. However, her answer to Interrogatory No. 41 (Exhibit 64, Tab B) shows that she worked from August 2009 through May 2013 at $485.00 per week. By applying those earnings for the 15 weeks in those quarters (from start date of 9/18/12 through the end of 2012), in lieu of the $442.00 shown on the Mullins chart, offsetting earnings for those quarters of $6,825.00 should be shown for those quarters. A low-benefit factor of 6% is applied to the earnings.

7. **Thelisa Sulton:** The records of Ms. Sulton, who in her answer to Interrogatory No. 40 (Exhibit 65, Tab B) waived her claim for back pay for the first application, from September 2009 through September 2012, were reviewed by the undersigned due to underemployment concerns raised by very

40

low quarterly earnings after her second application in 2012. From those records (again, no deposition was taken), the undersigned is unable to conclude that Ms. Sulton did not make an adequate effort to mitigate her damages. However, in ascertaining her but-for wages for the second application period (Dr. Mullins, at Exhibit G, page 51, applied the "D Seat" or training period pay rate only to the first application period), the Special Master modified the "Present Value Full-Time But-For Earnings" for Q4 2012 and Q1 2013 to $8,928 and $11,600, respectively, to more accurately depict her but-for earnings during the second-seat portion of what would have been her employment. The undersigned also notes that Ms. Sulton's cut-off date stems from a telephone call from Prime on April 12, 2013, and her voice mailbox was full and Ms. Sulton did not respond to the missed call. Inasmuch as there was no indication that a trainer was available at Prime, the undersigned used an end-of-quarter date for the actual cut-off of back pay eligibility.

      **8. Audrey White:** Audrey White's offsetting wage earnings in Q1 of 2014 and Q3 of '14 were (at zero and $1,200, respectively, Exhibit G, page 23), significantly lower than her other typical quarterly earnings. Her 2011 tax return shows earnings primarily from self-employment in an owner-operator trucking business. Exhibit 68. Similar self-employment is indicated on her 2012 return. No tax records are available in the record for 2013 and beyond (a fact which the Defendant emphasized to express its belief that the Claimants failed to adequately update their discovery responses in the lead-up to the evidentiary hearing.) In her deposition, she indicated she went into a lease agreement with CR England to get out of a training pay situation. She bounced from CR England (from trainee to lessee as an owner-operator, to US Express, Freight Systems and Swift, all because of her desire to earn more. Dr. LaJeunesse (and Dr. Mullins since he simply uses the EEOC cut-off date) would reflect in their calculations that Ms. White would still be in the back-pay period as of this date, 18 quarters by the end of this year. An earlier cut-off date is indicated by her work record and her entry for a short time into the business as a self-employed owner/operator. After Q2 of 2013 (her deposition was taken June 14,

2013), her actual earnings decreased from $10,646 for the quarter to $3,903 for the quarter. Her employment with Forward Air, which started in May 2013, paid her $1,109 per week (over $14,000.00 on a quarterly basis), higher than her but-for earnings at Prime would have been. That justifies a conclusion that Ms. White had, upon working with Forward Air, fully mitigated her damages and, once she quit that employment, was no longer adequately attempting to mitigate her damages. After considering all the facts available, the Special Master concludes that May 15, 2013, is an appropriate cut-off date for Ms. White, resulting in quarters of eligibility for back pay being reduced to 7.32 quarters.


s/Jeffrey W. Schaeperkoetter
Special Master

Dated: August 31, 2015

42