IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,    ) | |
|                  ) | |
|        **Plaintiff,**      ) | |
|                  ) | **Case No. 6:11-cv-03367-MDH** |
| **v.**                       ) | |
|                  ) | |
| **NEW PRIME, INC. d/b/a PRIME, INC.,**    ) | |
|                  ) | |
|        **Defendant.**     ) | |

## ORDER

Before the Court are the Special Master's Report and Recommendations (Doc. 365) and the parties' objections and responses thereto (Docs. 375, 376, 378, 379). Upon review and consideration, the Court hereby **ADOPTS IN PART AND REJECTS IN PART** the Special Master's Report and Recommendations.

## I. BACKGROUND

On August 14, 2014, the Court entered an order finding Prime's same-sex driver trainer policy was facially discriminatory and in violation of Title VII. The Court explained:

> In this case, Prime adopted a same-sex driver policy. The policy stated that women who applied to be students or entry level trainees would only be assigned to a female instructor or trainer, unless she had a pre-existing relationship with a male instructor or trainer. Prime contends it put the policy in place in order to protect female applicants. However, the policy is facially discriminatory, much like the policy in *Johnson Control*, in that it places limitations on the opportunities for female applicants to be trained versus men. Prior to this policy being implemented women were put on trucks with male or female drivers on a first come, first served basis. The same-sex policy created a waiting list for females while none existed for males. Therefore, there is no question the policy created an impermissible impediment to training and employment for female drivers that the male drives did not face. This was no small impediment but one which could require women to remain on the waiting list for a year or more while men faced no such delay. The Court finds Prime's same sex policy was the

> company's standard operating procedure and is facially discriminatory resulting
> in disparate treatment of female applicants and drivers.

Doc. 289, at 15 (footnote omitted). The Court granted partial summary judgment in favor of Plaintiff but denied summary judgment as to punitive damages and back pay, finding those matters involved genuine issues of material fact.

Following entry of partial summary judgment, the Court met with the parties to discuss scheduling for the remainder of the case. The parties consented to the appointment of a special master to decide the appropriate back pay amounts for the 63 claimants.[1] On March 9, 2015, the Court entered an order, pursuant to Federal Rule of Civil Procedure 53, appointing Jeff Schaeperkoetter to serve as Special Master "for the purpose of determining the availability and amount of any back pay due to the claimants in this case" (Doc. 316). The Special Master communicated directly with the parties and received briefing, expert testimony, and proposals regarding back pay. He held three days of evidentiary hearings on issues related to back pay. On August 31, 2015, the Special Master submitted a Report and Recommendations to the undersigned. The Report and Recommendations summarizes the positions of the parties, highlights differences between the experts' opinions regarding methodology, explains the Special Master's adopted methodology, and applies the Special Master's methodology to the claimants.

The methodology adopted by the Special Master is, generally, as follows. The "start" date for a claimant's back pay period was calculated at either 14 days or 42 days after the date the claimant submitted her application to Prime, depending on whether or not she had her CDL

---

[1] The parties' joint stipulation previously included 68 claimants (Doc. 310). The EEOC has since dropped five of the claimants from the case (Doc. 365 at 25).

at the time she applied.[2]  The "end" date for a claimant's back pay period was determined on a case-by-case basis taking into account the claimant's individual situation and mitigation principles.[3]  The Special Master expressed the claimant's total back pay period in quarters of years.  Once the Special Master determined the claimant's back pay period, he then calculated the claimant's "but for" earnings on a quarterly basis, including fringe benefits, and he adjusted those earnings to present value using Consumer Price Indices and the "weekly average 1-year constant maturity Treasury yield."[4]  The Special Master then subtracted from the claimant's adjusted quarterly "but for" earnings the claimant's quarterly "interim" earnings, which consisted of the claimant's actual earnings during the quarter or any earnings imputed by the Special Master to the claimant during the quarter, including fringe benefits.[5]  A claimant's total back pay consisted of the difference between the claimant's adjusted "but for" earnings and the claimant's "interim" earnings over the course of the back pay period.[6]  The Special Master also included the claimants' alleged out-of-pocket expenses in the final back pay award.

---

[2] The delay in start day takes into account the average period of training time during which the applicants were paid no compensation.  Applicants with their CDL were assigned a start date 14 days after the date of their application.  Applications without their CDL were assigned a start date 42 days after the date of their application.

[3] Overall, the Special Master found all claimants made a good faith effort to minimize their damages, at least initially, and no claimant was eligible for back pay beyond 2013.

[4] The quarterly "but for" earnings were based on average earnings data from Prime drivers who entered the program between January 2009 and August 2013.  The formula distinguished earnings between "second seat drivers" and "first seat drivers" per quarter.  The fringe benefits were calculated based on actual cost, as opposed to economic cost, and were calculated at 16.4% for second seat drivers and 19.1% for first seat drivers.  The Special Master used the "second seat driver" earnings for each claimant for their first 1.4 quarters with Prime based on the average transition time from second seat driver to first seat driver.

[5] Actual earnings were calculated per quarter based on W-2 information and included an estimated fringe benefit based on the type of work and the actual cost of the benefit as opposed to the economic cost of the benefit.  The Special Master included imputed earnings for claimants with lengthy periods of unemployment or underemployment; the Special Master applied a 6-week "waiting period" after the claimant applied to Prime prior to imputing any earnings and he imputed earnings equal to $290 per week, i.e. 40 hours at minimum wage.

[6] The Special Master did not apply, as suggested by the parties, an attrition rate.  He also found that a tax penalty offset was inapplicable because no claimant was entitled to a back pay award of more than $55,000.  The Special Master determined that no claimant earned excess mitigating earnings for any annual period.

Both parties have now filed objections to the Special Master's Report and Recommendations. Plaintiff objects to the prejudgment interest rate used by the Special Master to bring the "but for" earnings to present value and objects to the imputation of income. Defendant objects to the Special Master's refusal to apply the prejudgment interest rate to the claimant's "interim" earnings in addition to their "but for" earnings. Both parties further object to the back pay period calculated for certain individuals.

## II. STANDARD

Pursuant to Federal Rule of Civil Procedure 53(f) and the Court's order appointing the Special Master, the Court must decide de novo all objections to conclusions of law or findings of fact made or recommended by the master. Fed. R. Civ. P. 53(f)(3), (4). In calculating back pay, "[t]he district court has broad equitable discretion to fashion back pay awards in order to make the Title VII victim whole." *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 669-70 (8th Cir. 1992) (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-64 (1976)). Making the victim whole "requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." *Franks*, 424 U.S. at 764.

Where the trial court finds unlawful sex discrimination in violation of Title VII, there is a "strong presumption" that the victim is "entitled to a back pay award on the basis of what she would have earned absent the discrimination, less any amount she could have earned in mitigation." *Delight Wholesale Co.*, 973 F.2d at 670. The amount a claimant would have earned absent discrimination may include base salary, pay raises that the employee could reasonably have been expected to receive, and amounts attributable for sick leave, vacation pay, and other fringe benefits. *E.E.O.C. v. Fin. Assur., Inc.*, 624 F. Supp. 686, 693 (W.D. Mo. 1985).

4

The concept of mitigation derives from the statutory language that states that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). "A Title VII claimant has a duty to mitigate damages by exercising reasonable diligence to locate other suitable employment and maintain a suitable job once it is located." *Delight Wholesale Co.*, 973 F.2d at 670. "Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231-32 (1982). In sum, "[a] plaintiff's duty is one of reasonable diligence to seek out or not refuse a job that is substantially equivalent to the one at issue" and "[a] plaintiff's efforts to mitigate need not be successful but must represent an honest effort to find substantially equivalent work." *Mathieu v. Gopher News Co.*, 273 F.3d 769, 784 (8th Cir. 2001). The burden to prove a claimant did not use reasonable efforts to mitigate damages is on the defendant. *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999).

### III. DISCUSSION

The parties' objections to the Special Master's Report and Recommendations can be divided into two groups – objections to the overall methodology for calculating back pay and objections to the back pay awarded to specific claimants. The Court will address each group of objection in turn.

### A. Objections to Final Methodology Used to Determine Back Pay

The parties' objections to methodology concern: (1) the appropriate prejudgment interest rate, (2) whether the prejudgment interest should apply to only "but for" earnings or to both "but for" earnings and interim earnings, and (3) whether including imputed earnings was appropriate.

**1. Prejudgment Interest Rate**

Plaintiff objects to the prejudgment interest rate adopted by the Special Master. The Special Master employed Defendant's expert's method of "interest offset" by using the weekly average 1-year constant maturity Treasury yield rather than the IRS underpayment tax penalty rate as suggested by Plaintiff's expert. The Special Master cited to *Davis v. Kansas City Housing Authority*, 822 F. Supp. 609, 617 (W.D. Mo. 1993) and stated that "[w]hile it is a fair conclusion that the 'average market yield' on U.S. Treasury securities is a manipulated interest rate that bears no relationship to real life, it is the appropriate rate." Doc. 365, at 13.

Plaintiff argues the IRS underpayment tax penalty rate employed by its expert is more "in line" with both economic reality and the purposes for awarding prejudgment interest. Specifically, Plaintiff argues that consumer and mortgage interests rates are higher than the Treasury rate, that individuals are not capable of borrowing on the same terms as the U.S. Treasury, and that the Treasury rate is a poor reflection of lost investment opportunities because an investor would not be restricted to the low returns offered on short-term one-year Treasury bills. Plaintiff argues, in sum, that the Treasury rate does not make the victims of discrimination whole in this case. Defendant argues, conversely, that the Treasury rate is the appropriate prejudgment interest rate according to Eighth Circuit case law and 28 U.S.C. § 1961. Defendant notes that both Defendant's expert's and Plaintiff's expert (initially) used the Treasury rate and that both experts testified they had previously used of the Treasury rate.

Upon de novo review, the Court finds the Treasury rate is the appropriate prejudgment interest rate to use in this case. That rate is widely accepted and employed by district courts within this circuit to determine back pay in discrimination cases,[7] it has been approved for use in

---

[7] *See, e.g., E.E.O.C. v. Old Dominion Freight Line, Inc.*, No. 2:11-CV-02153, 2015 WL 3895095, at *14 (W.D. Ark. June 24, 2015) (ADA); *E.E.O.C. v. Dooley*, No. 04-4215, 2008 WL 631175, at *4 (D.S.D. Mar. 6, 2008) (Title VII);

Case 6:11-cv-03367-MDH   Document 385   Filed 12/14/15   Page 6 of 26

calculating prejudgment interest by the Eighth Circuit,[8] and it is sufficient to make the victims whole without punishing Defendant. The Court notes that the interest offset calculation of Defendant's expert, which was adopted by the Special Master, also applies Consumer Price Indexes on top of the Treasury rate to account for inflation. Accordingly, Plaintiff's objection is **OVERRULED**.

## 2. Application of Prejudgment Interest Rate

Defendant objects to the Special Master's refusal to apply the prejudgment interest rate to claimants' interim earnings. The Special Master explained his reasoning as follows:

> As mentioned earlier, Dr. Mullins applied a present value factor to both 'but-for' earnings at Prime and to the Claimant's actual, offsetting earnings. Conceptually, as it relates to mitigating earnings, this approach seems erroneous. The present value adjustment which Dr. Mullins applied to the Claimants' but-for earnings is appropriate because that adjustment reflects the present value of a monetary amount, i.e. their pay and benefits, that they never received. Applying a present value factor, however, to their mitigated earnings is inappropriate because it adjusts to a higher number [for] their mitigated earnings, which were received at the time of their employment, and likely consumed. That approach by Dr. Mullins punishes the Claimants, and must not be followed by the Court.

Doc. 365, at 12-13.

Defendant argues the law is clear that prejudgment interest is to be applied to both "but for" earnings and interim earnings and that the cumulative impact of the Special Master's failure to do so is "substantial," totaling approximately $106,902.53 for all claimants. Plaintiff argues the Special Master's logic is sound, fair, and is not contrary to any controlling precedent or Eighth Circuit case law. Plaintiff argues that "it would be patently unfair to impute interest on

---

*Mennen v. Easter Store*s, 951 F.Supp. 838, 863 n. 28 (N.D. Iowa 1997) (Title VII); *Davis v. Kansas City Hous. Auth.*, 822 F. Supp. 609, 617 (W.D. Mo. 1993) (Title VII); *Klask v. Nw. Airlines, Inc.*, No. 4-86-352, 1991 WL 346371, at *3 (D. Minn. Aug. 12, 1991) (Title VII).

[8] The Eighth Circuit has approved the use of the statutory post-judgment interest rate, i.e. the Treasury rate, for use in calculating pre-judgment interest in two ERISA cases. *See Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1331 (8th Cir. 1995) ("In *Dependahl*, this Court concluded that 28 U.S.C. § 1961 provides the proper measure for determining rates of both prejudgment interest and postjudgment interest. 653 F.2d at 1219.").

the Claimants' earnings that were undoubtedly spent to provide for themselves and their families and upon which no interest or other return was received."

Upon de novo review, the Court respectfully disagrees with the recommendation of the Special Master and finds the prejudgment interest rate should be applied to both claimants' "but for" earnings and claimants' interim earnings. Both experts in this case applied the interest offset to "but for" earnings and interim earnings.[9] A U.S. Department of Labor directive issued in 2013, the subject of which is "calculating back pay as part of make-whole relief for victims of employment discrimination," states that "the CO must compute interest on the total back pay amount (*i.e.* total earnings for the liability period, less appropriate deductions and interim earnings)." Def.'s Ex. T_D, at 17. In other words, the correct procedure for calculating back pay is to calculate the total amount of back wages due – by subtracting the interim earnings from the "but for" earnings – and then applying the appropriate interest rate to that amount. Based on this formula, the prejudgment interest rate should apply to both the claimants' "but for" earnings and the claimants interim earnings. Accordingly, Defendant's objection is **SUSTAINED**.

### 3. Imputed Earnings

Plaintiff objects to the Special Master's imputation of earnings. Although neither party suggested the imputation of income, the Special Master imputed income in certain instances to claimants who had lengthy periods of unemployment or underemployment following their application to Prime.[10] The Special Master explained his reasoning as follows:

> Some claimants had lengthy periods of unemployment or what the Special Master deemed underemployment during the time of their qualifying period. The

---

[9] Plaintiff's expert subtracted the claimants' interim earnings from their but for earnings and then applied the interest offset to the difference. Defendant's expert applied the interest offset to the "but for" earnings, applied the interest offset to the interim earnings, and then calculated the difference between the two. Had the experts been using the same numbers, their calculations would have resulted in the same result despite their separate approaches.

[10] The Special Master defined "underemployment" as "a period in which the Claimant could have obtained more highly-compensating temporary employment than they actually obtained." Doc. 365, at 19.

8

Defendant has taken the position that, generally, the failure to seek alternative employment shows a failure to mitigate damages which should bar recovery of back pay. That position ignores the scenario involved in each one of the Claimant's cases: that they applied for a position at Prime and were told, in essence, "thank you for applying, you are on our waiting list while we find you a female trainer, and that may take several months." In that circumstance, it is difficult to conclude that a Claimant should be barred from back pay because they did not find another job when they were on a "wait list" for an employer like Prime. At the same time, compensating those Claimants fully for those lengthy periods may seem to be punitive for Prime. Imputing income is a reasonable middle ground, and appears to be specifically authorized in the enforcement provisions contained in Title VII, 42 U.S.C. Sec. 2000(e)(5)(g)(1), in which it provides in part, "Interim earnings **or amounts earned with reasonable diligence** by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable" (emphasis added).

Doc. 365, at 18-19.

Plaintiff argues the Special Master's imputation of income was contrary to the Special Master's finding that "each of the Claimants, until the date specified as their back-pay eligibility cut-off date, made a good faith effort to minimize damages" and his finding that "the undersigned was unable to find . . . that the lengthy period of unemployment in some fashion resulted in a failure to mitigate damages." Doc. 365, at 18-19, 36. Plaintiff argues there is no authority to assign imputed income during a period of back pay where the claimants have used reasonable care and diligence to mitigate their damages and, further, that doing so would eliminate Prime's burden to establish failure to mitigate as required by Eighth Circuit precedent. Defendant argues the imputation of interim earnings is appropriate under Title VII and applicable case law. Defendant cites the testimony of its two expert witnesses who explained the high turnover rates in the trucking industry, the high demand for truck drivers, and the relative ease with which a trucking position can be obtained, and Defendant states that "[b]y imputing interim earnings, rather than cutting off back pay damages, the Special Master accommodated, and actually overcompensated, certain claimants."

The Court agrees with Plaintiff. As an initial matter, the Court notes that Title VII and related case law clearly allow a deduction from back pay for amounts that a claimant reasonably could have earned. *See* 42 U.S.C. § 2000(e)(5)(g)(1); *see, e.g., E.E.O.C. v. Delight Wholesale Co.*, 765 F. Supp. 583, 589-90 (W.D. Mo. 1991) *aff'd*, 973 F.2d 664 (8th Cir. 1992); *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864-65 (3d Cir. 1995). Here, the Special Master labeled the amounts he thought the claimants could have reasonably earned "imputed earnings." While such "imputed earnings" are within the Court's discretion to award, they are only appropriate in conjunction with a finding that the claimant has failed to, in some sense, mitigate her losses. *See Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983) ("The [back pay] amount, however, must be offset by any earnings . . . which the plaintiff could have earned through reasonable efforts to seek suitable alternative employment."); *Delight Wholesale Co.*, 973 F.2d at 670 ("Once the trial court found unlawful sex discrimination in violation of Title VII, there was a strong presumption that Childers was entitled to a back pay award on the basis of what she would have earned absent the discrimination, less any amount she could have earned in mitigation.").

Although issues involving failure to mitigate may seem troublesome, it is important to remember that an employee need only make "reasonable effort" to find suitable employment and that the unemployed or underemployed person "need not go into another line of work, accept a demotion, or take a demeaning position." *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231-32 (1982); *E.E.O.C. v. Fin. Assur., Inc.*, 624 F. Supp. 686, 693 (W.D. Mo. 1985). It is the employer's burden to show that the claimant did not make such "reasonable effort"; the employer must show that substantially equivalent work was available and that the claimant did not exercise reasonable diligence to obtain the employment. *Booker*, 64 F.3d at 864; *Fin. Assur.,*

Case 6:11-cv-03367-MDH   Document 385   Filed 12/14/15   Page 10 of 26

*Inc.*, 624 F. Supp. at 693. The Northern District of Iowa recently summarized mitigation as follows: "In general, a plaintiff fails to mitigate adequately and therefore is not entitled to [back] pay to the extent he or she fails to remain in the labor market, fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employment without good reason." *Baker v. John Morrell & Co.*, 263 F. Supp. 2d 1161, 1179 (N.D. Iowa 2003) *aff'd*, 382 F.3d 816 (8th Cir. 2004) (punctuation omitted).

Based on the foregoing, the Court finds imputation of income, i.e. reduction of back pay for amounts the claimants' could have earned with reasonable effort, was inappropriate in light of the Special Master's findings that "each of the Claimants, until the date specified as their back-pay eligibility cut-off date, made a good faith effort to minimize damages" and "the undersigned was unable to find . . . that the lengthy period of unemployment in some fashion resulted in a failure to mitigate damages." Doc. 365, at 18-19, 36. The Special Master apparently found Defendant's evidence insufficient to satisfy Defendant's burden to show that other jobs were available to the specified claimants and that those claimants did not exercise reasonable diligence to obtain employment under the circumstances. Notably, Defendant argues in its responsive suggestions that the claimants to whom damages were imputed were actually overcompensated because the Special Master imputed damages rather than cutting off their back pay; however, Defendant never states a specific objection to the Special Master's mitigation findings cited above and the Court cannot say the Special Master's findings are clearly erroneous. Accordingly, Plaintiff's objection is **SUSTAINED** and the imputed income added to certain claimants' interim back pay shall be deducted.

11

## B. Objections to Back Pay Calculated for Certain Individuals

The parties further object to the amount of back pay calculated for specific claimants. All objections on this ground dispute the length of the back pay period and, more specifically, the appropriate "end" date or "mitigation" date for damages. The Court will address each claimant in turn.

### 1. Sandra Davis Clark (#5)

The record shows that Sandra Davis Clark applied to Prime on September 23, 2010. At the time she applied, Ms. Davis already had her commercial driver's license (CDL) and experience as an over-the-road truck driver. Ms. Davis accepted a comparable position with Swift Transportation in January of 2011, and she worked as an over-the-road truck driver for Swift from January of 2011 to August of 2011. Ms. Davis reportedly left Swift because she was promised higher pay; however, Swift documents state Ms. Davis left "due to medical reasons." Ms. Davis then went to work as a company driver for Crete Shaffer from August of 2011 to June of 2012. She stopped working at Crete Shaffer because she reportedly caught a cold requiring hospitalization and her FMLA leave had expired. Ms. Davis thereafter did not return to work because she wanted to help her daughter, who was involved in a high-risk pregnancy, and she wanted to help care for her grandchild. Around the time of Ms. Davis' deposition in May of 2013, Ms. Davis reported that she had begun searching for employment again with other trucking companies. She stated that she had been invited to return to Crete Shaffer when she voluntarily departed but, as of the date of her deposition, she had not re-applied to Crete Shaffer and had no reason for failing to do so.[11]

---

[11] Crete Shaffer records actually state "no rehire low producer."

Upon de novo review, the Court agrees with the recommendation of the Special Master that Ms. Davis' back pay period should terminate as of June of 2012, which is when Ms. Davis voluntarily left her job at Crete Shaffer and opted not to return to work for personal reasons.[12] The Court rejects Defendant's argument that Ms. Davis' back pay period should have been cut off in August of 2011 due to her "excessive absenteeism" and her voluntary departure from Swift due to medical reasons. The Court notes that Ms. Davis immediately began working for Crete Shaffer after her departure from Swift, regardless of her reason for leaving Swift, and that there is no evidence to suggest that Ms. Davis ever took more leave while at Swift or Crete Shaffer than was permitted by law or contract, or than would have been permitted at Prime. The Court finds there is no valid basis to cut off Ms. Davis' back pay at the time she left Swift or at any time during her employment with Crete Shaffer. To the extent Defendant argues Ms. Davis' back pay period or damages should be reduced – rather than cut off – in order to account for her "excessive absenteeism," Defendant presents no authority to support such a proposition, Defendant presents no authority on what constitutes a reasonable amount of absenteeism, and Defendant requests no specific reduction for this Court to consider.[13] Based on the foregoing, Defendant's objection is **OVERRULED**.

## 2. Theodora Heath (#10)

The record shows that Theodora Heath applied to Prime on May 17, 2011, had zero over-the-road truck driving experience, and indicated she was interested in Prime's Student Driver

---

[12] At this time, Plaintiff clearly failed to make reasonable efforts to locate and maintain other suitable employment. This lack of reasonable effort continued even through the date of Ms. Davis' deposition, despite her applications to trucking companies, because Ms. Davis believed she was invited to return to Crete Shaffer but offered no reason why she had not attempted to contact them seeking reemployment.

[13] For example, Defendant fails to cite to the record and specify how many weeks should be subtracted from Ms. Davis' back pay period to account for her excess absenteeism, to specify how much "but for" income it believes should be reduced – and in which quarter – to account for her excess absenteeism, and/or to specify how much imputed income should be added – and in what quarter – based on what she reasonably could have earned without her "excessive" absences.

Case 6:11-cv-03367-MDH   Document 385   Filed 12/14/15   Page 13 of 26

Training Program.[14]   Ms. Heath admittedly applied to only Prime and no other trucking companies.  Ms. Heath stated that from May of 2011 to November of 2011 she was "waiting for Prime" and made some money "through music and stuff."   The record shows that Ms. Heath called Prime on multiple occasions through November of 2011 inquiring about her status on the wait list.  In November or December of 2011, Ms. Heath was accepted into a community college truck driver training program but she did not attend because it was too expensive.  Prime called Ms. Heath in March of 2012 to inform her that a trainer was ready and available to her but the file states Prime could not get ahold of Ms. Health and, after several unsuccessful attempts to contact her, Ms. Heath was taken off the waiting list.  Ms. Heath reportedly attempted startup ventures and searched for alternative employment after she was placed on Prime's waiting list in May of 2011 but she did not obtain another wage-earning job until she returned to work as a substitute teacher in September of 2012.

Upon de novo review, the Court agrees with the Special Master that Ms. Heath's back pay period should be cut off in March of 2012, which is when Prime attempted to contact Ms. Heath to inform her that a trainer was available but she could not be reached.  Plaintiff argues that Ms. Heath obtained comparable employment as a driver with PAM Transport during her back pay period and that her back pay damages should therefore continue through the date of judgment.  The Court finds no information in the record to indicate that Ms. Heath ever worked for PAM Transport and Plaintiff's brief cites to no part of the record to support such a proposition.  Regardless, assuming that she worked for that company after March of 2012, the Court finds Ms. Heath's back pay period was appropriately cut off when Prime attempted to

---

[14] Ms. Heath previously worked as a school teacher and customer service agent.  She stated that she was interested in the trucking industry because she wanted to do something different, because she spoke with her brother who worked for Prime, and because her school district was downsizing.  The record shows that Ms. Heath was terminated from her job as a school teacher due to excessive leave.

contact Ms. Heath to offer her a female trainer but Ms. Heath could not be reached. Plaintiff argues that a claimant is not required to later reapply for a position with an employer who previously refused to hire her for discriminatory purposes. The Court finds the situation presented here is more akin to the unconditional offer of employment discussed in *Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 232 (1982) as compared to the reapplication issue discussed in *United States v. City of Warren, Mich.*, 138 F.3d 1083, 1098 (6th Cir. 1998). In sum, the Court finds that, by March of 2012, the ongoing ill effects of the Defendant's refusal to hire the claimant had expired. Accordingly, Plaintiff's objection is **OVERRULED**.

### 3. Donna Knapp (#13)

The record shows Donna Knapp applied to Prime on July 27, 2010, had zero over-the-road trucking experience, and indicated she was interested in Prime's Student Driver Training Program.[15] Shortly after Ms. Knapp was placed on Prime's waiting list, she applied for truck driver training school with C.R. England, another trucking company, and obtained her CDL. She left C.R. England in October of 2010 due to an alleged incident of sexual harassment and almost immediately accepted a position with Werner Enterprises, another comparable trucking company, and completed her training there by November of 2010. Ms. Knapp has remained at Werner Enterprises since November of 2010.

Upon de novo review, the Court respectfully disagrees with the Special Master's determination that Ms. Knapp's back pay period should cut off in December of 2011. The Special Master noted that "[a]t any time during her employment at Warner, with her Commercial Driver's License in hand, Ms. Knapp could have reapplied to Prime and likely would have been welcomed as an employee." He found that "as of December 31, 2011, when Ms. Knapp had apparently settled in for the long term and, even in the turbulent labor market that swirled within

---

[15] Ms. Knapp had prior work experience as a school bus driver and left her prior employment because she moved.

the trucking industry, sought no other trucking company other than Warner as a suitable home, she had adequately mitigated her damages and was no longer eligible for back pay." Plaintiff argues that Ms. Knapp is not required under the law to apply or reapply to Prime while she maintains comparable employment. This objection as to Ms. Knapp is well-taken. *See United States v. City of Warren, Mich.*, 138 F.3d 1083, 1098 (6th Cir. 1998). Moreover, the Special Master's rationale for his recommended cut off period is in conflict with the claimant's obligation to make reasonable and good faith efforts to maintain substantially equivalent employment once it is obtained. *See Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985). Furthermore, Defendant failed to show that substantially equivalent work was available to Ms. Knapp and that she failed to exercise reasonable diligence to obtain that employment. In light of the foregoing, the Court **SUSTAINS** Plaintiff's objection and finds Ms. Knapp is entitled to back pay continuing to the date of judgment.

### 4. Lacolia Mungro (#17)

Lacolia Mungro applied to Prime on July 9, 2009, had zero over-the-road truck driving experience, and indicated she was interested in Prime's Student Driver Training Program.[16] One month prior to her application at Prime, Ms. Mungro applied to the truck driver training program at Wils-Trans but decided not to pursue that opportunity because she felt Prime was a superior company. After submitting her application to Prime in July of 2009, records indicate that Prime was waiting on Ms. Mungro to complete and provide a sleep study prior to her being placed on the wait list but Ms. Mungro believed she had already been placed on the wait list and that she merely needed to have a sleep study completed before she began working. Throughout 2009 and 2010, Ms. Mungro continued to work as a CNA while she was on Prime's wait list. Ms. Mungro did not apply to any other trucking companies or truck driver programs between July 9, 2009 and

---

[16] She previously worked as a CNA and was still employed as a CNA at the time she applied to Prime.

January of 2011.  She admitted that she could have started training at Wils-Trans "at any time" but she chose not to.  In January of 2011, Prime called Ms. Mungro and asked if she was still interested in attending Prime's Student Driver Program.  Ms. Mungro responded that she was moving and was unavailable; she admitted during her deposition that she "basically" declined a spot on the wait list at that time.

Upon de novo review, the Court agrees with the Special Master's recommendation that Ms. Mungro's back pay period should be cut off in January of 2011.  At that point, it was unequivocally clear that Ms. Mungro no longer wished to pursue employment with Prime and the record shows that she was not making an honest effort to find substantially equivalent work. *See Mathieu v. Gopher News Co.*, 273 F.3d 769, 784 (8th Cir. 2001) ("[a] plaintiff's duty is one of reasonable diligence to seek out or not refuse a job that is substantially equivalent to the one at issue").  Rather, Ms. Mungro engaged in both pre- and post- application employment as a CNA, she neither sought out nor applied to any other trucking companies or truck driver programs between July 9, 2009 and January of 2011, and she advised she no longer wished to be on Prime's waiting list in January of 2011.  The Court has considered Defendant's objection that Ms. Mungro's back pay period should cut off earlier than January of 2011, but the Court finds January of 2011 to be the most appropriate cutoff date.  Accordingly, Defendant's objection is **OVERRULED**.

### 5. Deidre Pasteur (#22)

The record shows Deidre Pasteur applied to Prime on December 30, 2010 and already had her CDL and some prior experience in the trucking industry.  In January of 2011, Ms. Pasteur accepted a job with Willie Shaw trucking company.  A Prime representative attempted to call Ms. Pasteur on February 17, 2011 to offer her a female trainer at Prime but Ms. Pasteur

could not be reached at the phone numbers she provided and Prime gave the trainer to another applicant. The record shows, however, that Ms. Pasteur remained in contact with Prime, at least via e-mail communications, through March of 2011. Ms. Pasteur remained at Willie Shaw for three to four months before she voluntarily quit due to low pay. In April of 2011, Ms. Pasteur took a job at Schneider trucking company and stayed there for three to four months before she voluntarily quit due to safety concerns. In August of 2011, Ms. Pasteur began working for Metropolitan Trucking but voluntarily quit in October of 2011 due to low pay. Ms. Pasteur then went to work for Mail Contractors for approximately one year before she left that company due to scheduling issues. She then immediately went to J&R Schugel and worked there from October of 2012 to February of 2013. During that time period, Ms. Pasteur worked for a few weeks at TLS Trucking as an owner/operator. As of the date of her deposition in November of 2013, Ms. Pasteur was working for a bus transportation company because she was unable to obtain local or regional work with a trucking company. Ms. Pasteur's records show she began working for Nissi Group in 2013 and by the first quarter of 2014, her earnings at Nissi Group exceeded her "but for" earnings at Prime.

Upon de novo review, the Court rejects the objection raised by Defendant that Ms. Pasteur's back pay period should be cut off in October of 2011 due to Ms. Pasteur's sporadic work history. There is no requirement that a victim of discrimination must stay with a single employer, only that she make reasonable efforts to mitigate. Here, Ms. Pasteur clearly put forth significant effort to obtain and maintain comparable trucking jobs. Furthermore, as highlighted by Plaintiff, Defendant's experts testified that frequent job turnover is normal in the trucking industry and is fueled by competing entities luring drivers with promises of better pay and working conditions. Accordingly, the Court finds Ms. Pasteur's back pay period should extend

to at least December of 2012, as determined by the Special Master.[17]  Defendant's objection is

**OVERRULED**.

### 6. Tracey Poe (#25)

Tracey Poe applied for an over-the-road driver position at Prime on September 28, 2010, had zero over-the road truck driving experience, and indicated she was interested in Prime's Student Driver Training Program.  At the time she applied, she was working as a bus driver.  She applied to several other trucking programs around the same time she applied to Prime but she felt misled by their recruiters and did not pursue those options.  Ms. Poe subsequently enrolled in truck driver school at a community college in January of 2011 and graduated in February of 2011.  Between March of 2011 and August of 2011, Ms. Poe worked as an over-the-road truck driver for James E. Owens Trucking but she reportedly left that job because she was teamed with her husband, marital problems arose, and the company would not allow her to get a truck of her own due to lack of experience.  After she left Owens, Ms. Poe searched and applied for other trucking jobs but was offered none due to lack of hiring, insurance issues, and lack of experience.  She worked various other jobs in 2011, including work as a bus driver, dump truck driver for an excavating company, and part-time housekeeper.  In February of 2012, Ms. Poe went to work as a residential advisor and driver for Old Dominion Job Corps.  She voluntarily quit her job at Old Dominion one year later when she moved to Florida.  After she moved to Florida, Ms. Poe applied to trucking companies and sought only local or regional work.  In May

[17] The Special Master found Ms. Pasteur's back pay period should end in December of 2012 because "by becoming self-employed as an owner-operator in the trucking business in January of 2013, Ms. Pasteur mitigated her damages[.]"  Doc. 365, at 32-33.  Plaintiff stated in its brief in opposition to Defendant's objection that "[t]he Special Master correctly found that Prime failed to prove that Pasteur did not mitigate her damages and correctly ended her back pay after 7.89 quarters when she became an owner operator and started to earn more than she would have at Prime."  Doc. 378, at 4-5.  The Court notes that Ms. Pasteur only worked as an owner/operator for TLS Trucking for approximately three weeks in January of 2013 and that she voluntarily returned to J&R Schugel because she "didn't make any money with [TLS]."  Ms. Pasteur's records do not show excess earnings until the first quarter of 2014, a year later.  Regardless, Plaintiff did not object to the back pay period for Ms. Pasteur, so the Court will adopt the Special Master's recommendation.

of 2013, Ms. Poe was offered a position at Swift Transportation but turned the position down because the position was long-haul and not local or dedicated routes.

Upon de novo review, the Court respectfully disagrees with the cutoff date recommended by the Special Master. The Special Master recommends that Ms. Poe's back pay period be cut off at May 15, 2012;[18] however, the Court finds a more appropriate cutoff date is August of 2011. In August of 2011, Ms. Poe voluntarily quit comparable employment at Owens due to personal reasons. Under Eighth Circuit case law, therefore, Ms. Poe failed to maintain a suitable job once located and failed to mitigate her damages by quitting comparable interim employment for personal reasons. *See, e.g., E.E.O.C. v. Delight Wholesale Co*., 973 F.2d 664, 670 (8th Cir. 1992). Furthermore, since she voluntarily left her job at Owens due to personal reasons, Ms. Poe has obtained no other substantially equivalent position to the one she was denied at Prime – i.e. an over-the-road truck driving position as opposed to a regional or local one. Based on the foregoing, the Court finds Ms. Poe's back pay should cease in August of 2011 and Defendant's objection is **SUSTAINED**.

### 7. Stacey Portis (#26)

Stacey Portis applied to Prime on February 19, 2008 while she was in the course of her truck driver training at DeKalb Technical. Around the same time, Ms. Portis applied to other trucking companies including Schneider, Conway, and Warner. Ms. Portis finished trucking school, obtained her CDL, and accepted a position at Conway in March of 2008. She has worked at Conway since that time and she has since been promoted to a supervisory role.

---

[18] The Special Master states: "She quit a truck-driving job with an excavating company in February 2012. By May 15, 2012, Ms. Poe could have obtained comparable employment in the trucking industry if she had been committed to long-haul trucking of the sort Prime required. She did not, and her eligibility for back pay is cut off on May 15, 2012, after 6.13 quarters." Doc. 365, at 33.

Defendant's expert's calculations show that Ms. Portis' earnings at Conway have been very similar, and in many cases greater than, her "but for" earnings at Prime.

Upon de novo review, the Court agrees with the Special Master that Ms. Portis' back pay period should be cut off in March of 2008. Ms. Portis attained substantially similar employment at Conway approximately one month after she applied to Prime and Dr. Mullins' calculations indicate Ms. Portis immediately began earning nearly as much, if not more, at Conway than she would have earned at Prime. Accordingly, the Court finds Ms. Portis fully mitigated the damages of Prime's unlawful discrimination by the cutoff date recommended by the Special Master. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 234, 236 (1982) ("the availability of the better job terminates the ongoing ill effects of the defendant's refusal to hire the claimant . . . In other words, the victim of discrimination who finds a better or substantially equivalent job no longer suffers ongoing injury stemming from the unlawful discrimination."). Based on the foregoing, Plaintiff's objection is **OVERRULED**.

### 8. Danessa Rauster (#29)

Defendant objected to the back pay period calculated for Danessa Rauster. Defendant states that Plaintiff stipulated to the back pay period for Ms. Rauster and the Special Master recommended a longer back pay period than was stipulated. Plaintiff agrees with Defendant's objection. Accordingly, Defendant's objection is **SUSTAINED** and Ms. Rauster's back pay is limited to the first quarter of 2011 and, as stipulated by the parties, an amount equal to $6,455.41 plus whatever interest continues to accrue until she is paid.

### 9. Geraldine Smith (#38)

Geraldine Smith applied to Prime on March 1, 2010 with no over-the-road truck driving experience and an interest in Prime's Student Driver Training Program.[19]  Ms. Smith wished to team with her friend Robert but Robert was ineligible to be a trainer so Ms. Smith was placed on the waiting list.  Around the same time, Ms. Smith applied to other training programs with comparable trucking companies, including American Trucking and Swift, but she did not take advantage of their training programs because they required her to work for their company after she completed the program but Ms. Smith wanted to "ride" with Robert and Robert worked at Prime.  While Ms. Smith was waiting to hear back from Prime, she began working door-to-door sales for a roofing company in June of 2010.  After six weeks, Ms. Smith was fired for not selling enough contracts.  In August of 2010, Ms. Smith formed her own roofing company with Robert and she has worked for that company since then.

Upon de novo review, the Court agrees with the Special Master that Ms. Smith's back pay period should be cut off in August of 2010.  At that point, it is clear that Ms. Smith had not and was not putting forth an honest effort to find substantially equivalent work in the trucking industry.  Although Plaintiff is correct that self-employment can constitute a reasonable good faith effort to mitigate damages, *see, e.g., Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988), in this case the Court finds that it did not.  Ms. Smith had other opportunities to enter similar driver programs but her admitted reason for failing to pursue those opportunities was because she wanted to "ride" with her friend Robert who worked for Prime.  The Court finds her refusal to pursue those other trucking opportunities was not reasonable and shows she did not make an honest effort to find comparable employment.  Furthermore, once

---

[19] She previously worked in a variety of jobs including real estate agent, personal assistant, and manager of an RV resort.  She stated she applied to Prime because Robert wanted to drive on a team with her and Robert asked her to.

Robert quit Prime and offered to start a roofing business with Ms. Smith, it is unequivocally clear that Ms. Smith no longer wished and no longer pursued a job at Prime or in the trucking industry at all. Accordingly, the Court adopts the recommendation of the Special Master and Plaintiff's objection is **OVERRULED**.

**10. Audrey White (#40)**

The record shows that Audrey White applied to Prime on July 13, 2011, had zero over-the-road trucking experience, and expressed an interest in Prime's Student Driver Training Program.[20] In August of 2011, Ms. White entered into a comparable truck driver training program with C.R. England, obtained her CDL, and took on a lease as an operator with C.R. England. She voluntarily left C.R. England in January of 2012 because she felt she was not getting enough miles. Ms. White then immediately went to work for U.S. Express. In March of 2012, Ms. White left U.S. Express to work for Freight Systems. She worked for Freight Systems until March of 2013, when she voluntarily quit because she no longer wanted to work over-the-road. Ms. White then briefly worked for Swift before she began working for a local contractor associated with Forward Air where she reportedly made $1,109.00 per week. Ms. White was working for Forward Air at the time of her deposition and there is no updated earnings evidence in the file since then.

Upon de novo review, the Court agrees with the Special Master that Ms. White's back pay period should be cut off in May of 2013. While employed with Forward Air, Ms. White's reported earnings were $1,109 per week, which is greater than her weekly earnings would have been at Prime. Thus, Ms. White had fully mitigated her damages at the time she was working for Forward Air. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 234, 236 (1982) ("the victim of discrimination who finds a better or substantially equivalent job no longer suffers ongoing injury

---

[20] She previously worked as an online process and data entry clerk.

23

stemming from the unlawful discrimination."). Defendant objects to the cutoff date and argues Ms. White's back pay period should be cut off at the end of January 2012 because she voluntarily left C.R. England at that time and her compensation at C.R. England was comparable to what she would have earned at Prime. The Court rejects that argument. Defendant argues that Ms. White's annualized compensation at C.R. England would have been approximately $10,683 per quarter plus benefits; however, even factoring in 19.1% employer benefits, Ms. White's quarterly earnings at C.R. England would still be approximately $1,000 less per quarter than they would have been at Prime. Moreover, Ms. White reportedly left C.R. England because she was not getting enough miles to afford her lease, she did not think getting enough miles would be an issue at Prime, and Prime presented no evidence to the contrary. Ms. White left C.R. England for what she perceived to be a better opportunity at U.S. Express. *See E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992) ("a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment."). Accordingly, the Special Master correctly found that Ms. White's back pay period continued to May of 2013. Defendant's objection is **OVERRULED**.

## 11. Doretta Lawson (Pendergrass) (#52)

Doretta Lawson applied to Prime on August 6, 2012, had no prior over-the-road trucking experience, and indicated she was interested in Prime's Student Driver Training Program.[21] Ms. Lawson attended Route 66 Truck Driving School from August of 2012 to October of 2012 and graduated with her CDL. Upon graduation, Ms. Lawson went to work for Wil-Trans Trucking. She left Wil-Trans in February or March of 2013 due to issues with her trainer and immediately went to work for Mijenn. In March or April of 2013, Ms. Lawson received correspondence from

---

[21] She previously worked as a waitress and nursing assistant and graduated earlier that year from ITT Technical College with a degree in criminal justice.

the EEOC regarding this lawsuit. In April or May of 2013, Ms. Lawson learned from friends that Prime had changed their policy regarding female trainers. In June of 2013, Ms. Lawson left Mijenn due to low pay and lack of benefits and went work as a driver for Central Trucking. Ms. Lawson voluntarily quit her job at Central Trucking in September of 2014 to be home with her son.

Upon de novo review, the Court respectfully disagrees with the cutoff date recommended by the Special Master. The Special Master concluded that, because Ms. Lawson was aware of the change in Prime's policy and lawsuit at the time she left Mijenn, and because she did not re-apply or reach out to Prime before she went to work for Central Trucking, her back pay period should be cut off in June of 2013. Plaintiff objects and argues that the law does not require Ms. Lawson to reapply at the company that has previously discriminated against her. Plaintiff's argument is well-taken. While it is true that an employer's unconditional offer to work a job previously sought and discriminatorily denied to a claimant can toll the employer's back pay liability to the claimant, *see Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 232 (U.S. 1982), a mere notice of change in policy and invitation to reapply does not. *See, e.g., United States v. City of Warren, Mich.*, 138 F.3d 1083, 1098 (6th Cir. 1998); *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859 (11th Cir. 1986). Moreover, Ms. Lawson received no "unconditional offer" from Prime in this case as opposed to merely hearing about a change in policy through a third party. Furthermore, even if Prime had made such an offer, Ms. Lawson's refusal of that offer would be reasonable in light of the harassing statements allegedly made by Steven Larson during a post-application meeting. *See generally Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1279 (11th Cir. 1992) (finding an unconditional job offer did not toll liability where the claimant reasonably rejected the offer).

Based on the foregoing, the Court finds the appropriate cut-off date for Ms. Lawson's back pay period is September of 2014, which is when Ms. Lawson voluntarily quit her employment at Central Trucking for personal reasons and did not seek other suitable employment. Accordingly, Plaintiff's objection is **SUSTAINED**.

## IV. CONCLUSION

Based on the foregoing, the Report and Recommendations (Doc. 365) is hereby **ADOPTED IN PART AND REJECTED IN PART**. The Court orders the parties to re-calculate the back pay award for each claimant based on the Court's rulings in this Order. The parties shall confer with one another and file a joint report to the Court including a copy of the appropriate payout amounts for each claimant under the rulings contained herein. If the parties, after a good faith effort, cannot agree as to the appropriate back pay amounts for claimants under the Court's rulings contained herein, the parties shall file a report to the Court including a list of the claimant awards that the parties can agree on and a list of the claimant awards that the parties cannot agree on. The parties shall file a report to the Court on or before January 14, 2016, unless the Court orders otherwise.

**IT IS SO ORDERED**.

Date: December 14, 2015                     */s/ Douglas Harpool*_____
                                            **DOUGLAS HARPOOL**
                                            **UNITED STATES DISTRICT JUDGE**